IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONNA LYNN MALONE
Individually and as Administrator of the
Estate of THOMAS ALAN GOSIER
257 Seneca Drive, Apt. 2W
Syracuse, New York 13205

     and

To The Use Of: Daniel Gosier
     Address Unknown

     Plaintiffs,

vs.

WICOMICO COUNTY MARYLAND
     Serve: Bob Culver
     Wicomico County Executive
     125 N. Division St. Room 303
     PO Box 870
     Wicomico County

     and

GEORGE KALOROUMAKIS
     Serve at: Wicomico County
     Detention Center
     411 Naylor Mill Road
     Salisbury, Maryland 21801
     Wicomico County

     and

OTHA LEE BYRD, JR.
     Serve at: Wicomico County
     Detention Center
     411 Naylor Mill Road

Case No._____

**Jury Trial Demanded**

Salisbury, Maryland 21801  *
Wicomico County  *

  *

 and  *

  *

ROBERT LEE O'DAY  *
 Serve at: Wicomico County *
 Detention Center  *
 411 Naylor Mill Road  *
 Salisbury, Maryland 21801 *
 Wicomico County  *

  *

 and  *

  *

JAMES CHARLES BARE  *
 Serve at: Wicomico County *
 Detention Center  *
 411 Naylor Mill Road  *
 Salisbury, Maryland 21801 *
 Wicomico County  *

  *

 and  *

  *

DORETHA RENATA CARROLL *
 Serve at: Wicomico County *
 Detention Center  *
 411 Naylor Mill Road  *
 Salisbury, Maryland 21801 *
 Wicomico County  *

  *

 and  *

  *

BRITTANY STEVENSON  *
 Serve at: Wicomico County *
 Detention Center  *
 411 Naylor Mill Road  *
 Salisbury, Maryland 21801 *
 Wicomico County  *

  *

 and  *

  *

FORREST DEVINE  *
 Serve at: Wicomico County *

Detention Center                                        *
411 Naylor Mill Road                                    *
Salisbury, Maryland 21801                               *
Wicomico County                                         *
                                                        *
                                                        *
      and                                               *
                                                        *
CONMED, LLC, a division of                              *
WELLPATH, LLC f/k/a CORRECT                             *
CARE SOLUTIONS, LLC                                     *
      Serve on:                                         *
      Corporate Creations Network, Inc.                 *
      #700, 2 Wisconsin Circle                          *
      Chevy Chase, Maryland 20815                       *
      Anne Arundel County                               *
                                                        *
      and                                               *
                                                        *
JOHN AND JANE DOES 1-25                                 *
                                                        *
      Defendants.                                       *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## COMPLAINT AND JURY DEMAND

Plaintiffs Donna Malone, Individually, and as Administrator of the Estate of her

deceased son, Thomas Alan Gosier, and use plaintiff Daniel Gosier allege as follows:

1.      This is an action arising out of the death of twenty-two-year-old Thomas

Gosier while in the custody of the Wicomico County Department of Corrections. By the

deliberate indifference and gross negligence or negligence of Wicomico County,

Warden/Director Kaloroumakis, and the employees and/or agents of Wicomico County

and/or Wicomico County Detention Center, Thomas Gosier, while suffering from extreme

mental illness and the destructive symptoms of drug withdrawal, and after one desperate

attempt to commit suicide while detained, was placed in solitary confinement with

unrestricted access to implements the Defendants knew could be – and often were – used by detainees to commit suicide. On 21 August 2016, as a direct and foreseeable result of the Defendants' conduct, Thomas Gosier used his bed sheets to tie a noose around his neck and hang himself from the top bunk in his cell. Although still alive when he was found, Mr. Gosier never regained neurological function and was pronounced dead the following day.

## PARTIES

1.      Plaintiff Donna Lynn Malone is, and at all times relevant has been, a resident of Syracuse, New York. Ms. Malone is the mother of decedent Thomas Alan Gosier and was appointed Administrator of his estate on April 16, 2018. A copy of the Certificate of Appointment issued by the Surrogate's Court of Onondaga County New York is attached hereto as Exhibit A.

2.      Use Plaintiff Daniel A. Gosier is the biological father of the decedent Thomas Alan Gosier. Daniel A. Gosier's current whereabouts are unknown. Both Ms. Malone and her attorneys have undertaken substantial – albeit unsuccessful – efforts to locate Daniel Gosier. As a result, the Surrogate's Court for the State of New York, Onondaga County dispensed with service of process for purposes of administering Thomas Gosier's estate. A copy of this complaint was sent to Daniel Gosier's last known address.

3.      Defendant Wicomico County is an entity of local government of the State of Maryland that, by virtue of the Maryland Constitution and the Wicomico County Charter, is a body corporate and politic that possess the rights of self-government and home rule. Wicomico County owns, and through its Department of Corrections, operates the

Wicomico County Detention Center ("WCDC"). Wicomico County was, at all relevant times, responsible for the policies, practices, customs, and regulations governing and used at WCDC and for the misconduct, acts, and omissions of its employees, agents, and/or servants. Wicomico County was given notice of this claim pursuant to Md. Code Ann., Cts. & Judicial Proc. § 5-304 on or about November 28, 2016. A copy of the letter is attached hereto as Exhibit B

4. Defendant George Kaloroumakis ("Kaloroumakis") is, and at all relevant times was, employed by Wicomico County as the Director of WCDC. Mr. Kaloroumakis is responsible for: (a) establishing and enforcing the policies and practices of WCDC and its employees; (b) the hiring, training, and supervision of WCDC employees; (c) operating WCDC in conformity with requisites of the United States Constitution, federal statutes, the Maryland Declaration of Rights, and Maryland statutes, rules, and administrative regulations; and (d) ensuring that county employees who work at and/or operate WCDC also comply with all applicable laws and regulations.

5. At all relevant times, Defendant Otha Lee Byrd, Jr. ("Byrd") was a correctional officer employed by Defendant Wicomico County at WCDC.

6. At all relevant times, Defendant Robert Lee O'Day ("O'Day") was a correctional officer employed by Defendant Wicomico County at WCDC.

7. At all relevant times, Defendant James Charles Bare ("Bare") was a correctional officer employed by Defendant Wicomico County at WCDC.

8. At all relevant times, Defendant Doretha Carroll ("Carroll") was a correctional officer employed by Defendant Wicomico County at WCDC.

9.     At all relevant times, Defendant Brittany Stevenson ("Stevenson") was a correctional officer employed by Defendant Wicomico County at WCDC.

10.    At all relevant times, Defendant Forrest Devine ("Devine") was a correctional officer employed by Defendant Wicomico County at WCDC.

11.    Upon information and belief, Defendant Conmed, LLC f/k/a Conmed, Inc. ("Conmed") is a Maryland Limited Liability Company that provides healthcare services to detainees through contracts with individual correctional facilities.

12.    Upon information and belief, Conmed was acquired by Correct Care Solutions, LLC ("CCS") in 2012 and then CCS was acquired by Wellpath, LLC ("Wellpath") in 2019. Conmed and CCS are wholly owned subsidiaries of Wellpath.

13.    Upon information and belief, Conmed, CCS, and Wellpath operate as one business unit and, collectively, contracted with Wicomico County, through its Department of Corrections, to provide healthcare to detainees at WCDC, including Mr. Gosier.

14.    Hereinafter, Conmed, CCS, and Wellpath are collectively referred to as Defendant Conmed.

15.    Defendants John and Jane Does 1-25, at all times relevant herein, were correctional officers and/or staff employed by Defendant Wicomico County at WCDC.

16.    Defendants Byrd, O'Day, Bare, Carroll, and John/Jane Does 1-25 are hereinafter collectively referred to as the "Correctional Officer Defendants."

**JURISDICTION AND VENUE**

17.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, as this case involves question of federal law, and, as to the remaining

claims, pursuant to 28 U.S.C. §1367.

18.     All Defendants either reside in, are employed in, or conduct substantial business in Wicomico County, Maryland and all the tortious acts or omissions giving rise to the claims asserted herein were committed in Maryland. Venue is therefore proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## FACTS

19.     Upon information and belief, Thomas Alan Gosier suffered from bipolar disorder and/or schizophrenia, as well as a crippling addiction to drugs of abuse.

20.     In the early evening of August 12, 2016, PFC Barkley, an officer with the Salisbury Police Department, responded to a call reporting an alleged theft that occurred at a Giant grocery store in Salisbury, Maryland.

21.     The Giant store manager alleged that he witnessed Mr. Gosier stuff numerous items into his pockets and attempt to leave without paying.

22.     When confronted, Mr. Gosier allegedly left the store and threw the items into a nearby storm drain.

23.     PFC Barkely reported that he retrieved several bottles of Benzedrex nasal spray, with a cumulative value of $47.92, from the storm drain.

24.     It is widely understood, particularly among law enforcement, that individuals that suffer from drug addiction target Benzedrex because it is an over-the-counter product that, when abused, mimics the high achieved from abusing amphetamines.

25.     Upon being placed under arrest, despite the relatively unserious nature of his crime, Mr. Gosier became emotionally erratic and frenzied in the rear of the police car. Mr.

Gosier thrashed around the inside of the vehicle, purposefully slamming his head into the rear window and desperately expressing his intent to commit suicide.

26.     Recognizing Mr. Gosier's mental instability, PFC Barkley executed a Petition for Emergency Evaluation under Md. Health General § 10-620 *et seq* and transported Mr. Gosier to Peninsula Regional Medical Center ("PRMC") for evaluation.

27.     PFC Barkley noted in the Petition that Mr. Gosier's suicidal ideations were accompanied by talk of multiple suicide attempts in the past and that Mr. Gosier was currently was currently prescribed multiple antipsychotic medications (Risperdal and Zypraxin [sic]) to treat his mental health disorders.

28.     At PRMC, Mr. Gosier was examined by Elizabeth Townsend and emergency medicine physician Dr. William Wild, a member of Emergency Services Associates.

29.     Along with Defendant Wellpath, PRMC, Elizabeth Townsend, Dr. Wild, and Emergency Service Associates are defendants in a parallel action for medical malpractice filed in Maryland Healthcare Alternative Dispute Resolution Office.

30.     Dr. Wild met with Mr. Gosier for approximately ten minutes before concluding, despite all evidence to the contrary, that Mr. Gosier was not an acute suicide risk.

31.     On information and belief, Dr. Wild failed to consider Mr. Gosier's mental illness and failed to consult with a licensed mental health professional.

32.     Just twenty-three minutes after arriving at PRMC, Mr. Gosier was discharged back into the custody of the Salisbury Police Department ("SPD") with a diagnosis of depression.

Mr. Gosier's Detention And Suicide

33.     After discharge from PRMC, Mr. Gosier was transported to WCDC, where he was held on $10,000 bond.

34.     Mr. Gosier was thereby placed into the complete custody, control, care and protection of Defendant Kaloroumakis and the Correctional Officer Defendants who were at all relevant times acting within the scope of their employment and/or agency with Wicomico County, Maryland, and acting under color of law.

35.     Upon information and belief, Mr. Gosier was initially held in the central booking unit of WCDC for approximately sixteen hours until 12:22 hours on 13 August, when he was placed on suicide watch in a specialized medical "pod" within B-block at WCDC.

36.     Upon information and belief, suicide watch requires precautions including, but not limited to, constant video surveillance, regular checks by correctional officers, and property restrictions. The property restrictions include provision of only a single cot or bunk that is low to the ground and equipped with an unbreakable plastic mattress. Prisoners on suicide watch are also denied access to bedding.

37.     Upon information and belief, these policies are applied to detainees on suicide watch because the Defendants have actual knowledge that failing to take said precautions substantially increases the risk of suicide by detainees determined to be at risk.

38.     Mr. Gosier's mental and physical state was so desperate, however, that he attempted to "overcome" suicide watch. On 14 August 2016, Mr. Gosier used his teeth to rip apart the "unbreakable" plastic mattress and attempt suicide by asphyxiation by

wrapping the shredded plastic around his neck. Fortunately, on this occasion, the suicide watch precautions rendered Mr. Gosier's attempt unsuccessful.

39.     This attempt put all Defendants on actual and express notice that Mr. Gosier was not simply seeking attention by threatening suicide – he was willing and able to go to great lengths to harm himself.

40.     The Defendants failed, however, to provide Mr. Gosier with the medical care and institutional support to which he was entitled under the U.S. Constitution.

41.     Upon information and belief, Mr. Gosier was denied mental health services and the prescription medication required to treat his mental illness and regulate is erratic behavior.

42.     Just two days later, on 16 August, Mr. Gosier was, for reasons heretofore unknown, placed in "F-Pod," an isolated cluster of seven cells where detainees serve informal sentences for disciplinary violations.

43.     Upon information and belief, Defendants Byrd, Stevenson, Devine, and/or John Does 1-25 were expressly aware of Mr. Gosier's previous suicide attempt(s);

44.     Upon information and belief, Defendant Byrd and/or John Does 1-25, in the role of shift supervisor, initiated and/or approved Mr. Gosier's transfer to "F-Pod."

45.     While on "F-Pod," detainees are locked in a cell for 23 of 24 hours each day. Their one hour of recreation, also carried out in isolation, allowed them to roam an interior common area not more than 200 square feet. The only recreational "activity" afforded detainees on "F-Pod" is a small television in the common area.

46.     Mr. Gosier was suffering from severe mental illness, likely suffering from

the effects of drug withdrawal, and had attempted suicide less than 48 hours prior to being sent to "F-Pod."

47.    It is widely accepted that subjecting prisoners to prolonged periods of solitary lockdown – particularly those with a history of mental health disorders and/or drug addiction – substantially increases the incidence of suicidal ideation and the likelihood of suicide attempt.

48.    Unsurprisingly, Mr. Gosier's mental state deteriorated quickly during his isolation and he was transferred back to the Medical Pod and placed on suicide watch after less than 24 hours on "F-Pod."

49.    Again, however, with no reasonable justification, Mr. Gosier was only kept on suicide watch for one day before being sent back to "F-Pod."

50.    Upon information and belief, Defendant Byrd and/or John Does 1-25, in the role of shift supervisor, initiated and/or approved Mr. Gosier's transfer to "F-Pod."

51.    Compounding the relentless toll of solitary confinement on Mr. Gosier's mental state, the disciplinary cells on "F-Pod" gave him full access to a standard mattress and bedding, as well as a top bunk. As evidenced by the denial of these comforts to detainees on suicide watch, Defendants were acutely aware that such access provided mental ill detainees with the means to commit suicide by hanging.

52.    In addition to the means, the Defendants provided Mr. Gosier with the substantial opportunities to harm himself. While on "F-Pod," correctional officers are unable to perform constant video surveillance of detainees inside their cells and, even though Mr. Gosier was placed on "welfare watch," he was only checked on by correctional

officers every twenty minutes, significantly less often than detainees on suicide watch.

53.     From Mr. Gosier's cell, he could even see a clock in the hallway outside "F-Pod," so he knew exactly how long he had before the next welfare check. Given that most detainee suicides take less than five minutes, and that his "F-Pod" cell contained the necessary implements, Defendants provided Mr. Gosier with all he needed to commit suicide successfully.

54.     On 21 August 2016, at approximately 12:38 hours, Correctional Officers O'Day and Bare entered "F-Pod" to complete cell checks, presumably including Mr. Gosier's welfare check.

55.     After O'Day and Bare exited "F-Pod," the only surveillance of Mr. Gosier's cell was by Correctional Officer Carroll looking at the display of a camera located in the common area of the pod. The camera looked at the small rectangular window of Mr. Gosier's cell from a severe angle, rendering Carroll unable to discern any activity inside.

56.     At approximately 12:44 hours, Mr. Gosier applied two lengths of toilet paper to the window in the door to his cell, obscuring all view of his actions inside.

57.     On information and belief, any coverage of this window was prohibited, in part because it may provide detainees an opportunity for self-harm completely out of the view of any WCDC staff.

58.     At some point thereafter, Carroll notified O'Day "through a small window" that Mr. Gosier had covered the window to his cell.

59.     Mr. Gosier's cell window was covered for approximately ten minutes before O'Day and Bare re-entered "F-Pod."

60.     Although O'Day and Bare were presumably responding to Carroll's report that Mr. Gosier's window was covered, O'Day took the opportunity to complete his normal check of all seven cells.

61.     After checking Cell 1, which consists of scanning the receiver on the cell door with his handheld computer, O'Day approached Cell 2, where Mr. Gosier was in the process of hanging himself from his bunk behind only the cover of two lengths of toilet paper. Despite the clear danger indicated by a mentally ill patient with suicidal ideations covering his cell window, and after calling out to Gosier and receiving no response for approximately sixteen seconds, O'Day consciously disregarded Gosier's welfare and carried out his normal check of the remaining cells on "F-Pod."

62.     After deliberately scanning the receivers on the doors of Cells 3, 4, 5, 6, and 7, O'Day returned to Mr. Gosier's cell door at approximately 12:55:09 hours. Again unable to elicit a response from Mr. Gosier, O'Day casually instructed the detainee from Cell 5, then out on recreation time, to return to his cell.

63.     It was not until approximately 12:55:30 hours, eleven and a half minutes after he covered the window to his cell, that Carroll opened Mr. Gosier's cell door.

64.     Upon entering Mr. Gosier's cell, Correctional Officers O'Day and Bare observed Mr. Gosier hanging from the top bunk, with a bedsheet fashioned into a noose and wrapped tightly around his neck. According to Bare, Mr. Gosier was gasping for breath, with mucus excreting from his nose and mouth.

65.     Bare and O'Day were able to cut Mr. Gosier from the makeshift noose and call for medical assistance. After WCDC staff performed CPR for a period of time, Mr.

Gosier was transported by ambulance to PRMC.

66.     Multiple doses of epinephrine resulted in Mr. Gosier regaining a pulse but he never regained any signs of neurological function. Mr. Gosier was pronounced dead on 22 August 2016 at 17:14 hours.

**COUNT I**
**42 U.S.C. § 1983**
**All Defendants**

67.     The allegations in paragraphs 1 through 66 are incorporated by reference as though fully set forth herein.

68.     This Count arises under 42 U.S.C. § 1983, and is alleged against all Defendants for their actions, inactions, supervision, or supervisory directives causing and/or knowingly acquiescing in personnel's decision to refuse to safeguard Thomas Gosier, thereby causing the deprivation of Mr. Gosier's constitutional rights to personal security and protection under the Fourteenth Amendment to the Constitution.

69.     Under the Eighth and Fourteenth Amendments to the United States Constitution the Defendants owed a duty of care to Mr. Gosier to provide him with medical care in accordance with the standards of delivery of such care in the State of Maryland; institute and enforce policies that would maintain his well-being while in the custody of WCDC; monitor him, and provide him with timely and appropriate medication.

70.     Mr. Gosier was at all times a pre-trial detainee at WCDC and was therefore owed the protections of due process of law pursuant to the Fourteenth Amendment to the U.S. Constitution. Detainees and inmates are constitutionally entitled to detention in an environment that offers reasonable protection from harm.

71.     At all relevant times, Defendants had actual knowledge that Thomas Alan Gosier:

     a.  Suffered from severe mental illness including, but not limited to, bipolar disorder and schizophrenia;

     b.  Suffered from drug addiction at the time of his arrest and detention;

     c.  Was likely suffering from the physical effects of drug withdrawal during his detention;

     d.  Had a history of suicidal ideation and suicide attempts;

     e.  Had recently expressed suicidal ideations and attempted suicide during his detention; and

     f.  His recent expressions of suicidal ideations and attempted suicide occurred in response to facing a minor criminal charge of theft under $50.

72.     At all relevant times, Defendants knew that each of the facts listed in the previous paragraph are clear indicators that a detainee is at substantial risk for self-harm.

73.     Defendants also knew that detainees in pre-trial confinement, including Mr. Gosier, are far more likely to attempt suicide than inmates serving a prescribed sentence.

74.     Defendants were therefore acutely aware that Mr. Gosier was at extreme risk for self-harm.

75.     Despite this knowledge, Defendants, among other things:

     a.  Housed Mr. Gosier alone, without a cell mate;

     b.  Failed to provide Mr. Gosier with adequate medical care, including mental health counseling, even after he attempted suicide;

c.  Failed to provide Mr. Gosier with the appropriate medication to treat his mental illnesses;

d.  Housed Mr. Gosier with detainees that demonstrated disciplinary issues;

e.  Held Mr. Gosier under prolonged periods of solitary confinement;

f.  Allowed Mr. Gosier to have access to personal property, including bed sheets, that Defendants knew could be – and had been – used to attempt suicide by hanging;

g.  Housed Mr. Gosier in a cell with a top bunk that Defendants knew could be – and had been – used by detainees to attempt suicide by hanging;

h.  Failed to observe Mr. Gosier with constant video surveillance;

i.  Failed to perform in-person welfare checks in increments of fifteen minutes or less;

j.  Failed to inform correctional officers responsible for monitoring Mr. Gosier's welfare that he was at substantial risk for self-harm; and

k.  Failed to respond promptly follow up when Mr. Gosier covered the window to his cell despite knowledge that this was often a tactic used by detainees attempting to obscure suicide attempts.

76.  Defendants committed the acts and omissions in the previous paragraph with deliberate indifference toward Mr. Gosier and intentional disregard for his physical and mental health.

77.  The violations of Mr. Gosier's civil rights as well as the deliberate indifference and reckless disregard to Mr. Gosier's and similarly situated detainees' and

detainees' medical needs and safety were the direct and proximate results of the customs, policies, and practices of Wicomico County and Director Kaloroumakis.

78.     Wicomico County and Director Kaloroumakis expressly or tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, and knew or should have known that such conduct was unjustified and would result in violations of Constitutional rights.

79.     These customs, policies, and practices constituted standard operating procedures at WCDC.

80.     Such policies, customs and/or practices include, inter alia: an ongoing pattern of deliberate indifference and reckless disregard to the health needs and safety of WCDC detainees; the failure to maintain healthcare staffing and facilities sufficient to provide for the health and safety needs of suicidal and at-risk WCDC detainees and inmates, including the failure to provide adequate mental health care and treatment, including but not limited to failures to take necessary steps to prevent self-injurious behavior, to plan for and arrange for critically needed care and supervision, and to respond to clear signs of mental illness and/or a history and use of psychotropic medications or narcotics or behavior otherwise demonstrating self-injurious tendency or suicidal ideation; the failure to properly train or staff WCDC medical and supervisory professionals; the failure to properly train and/or supervise WCDC non-medical staff regarding the identification and treatment of mentally ill, drug-addicted, and/or potentially suicidal detainees; the failure to comply with medical professionals' judgments and/or orders regarding tests and/or procedures for mentally ill, drug-addicted, and/or potentially suicidal detainees; the policy or custom of refusing to

transport mentally ill, drug-addicted, and/or potentially suicidal detainees outside the WCDC for hospital treatment; the policy, custom, or practice of placing detainees who are potential suicide threats in "lockdown" areas of the Detention Center that are unsafe and not continuously visible to staff members; the policy, custom, or practice of permitting detainees who are mentally ill, drug-addicted, and/or potentially suicidal to be placed in and/or to remain in cells with instrumentalities and configurations providing the means to commit suicide; the policy, custom, or practice of neither soliciting, nor sharing, information communicated to the WCDC about detainees' and detainees' mental health issues, and the policy, custom, or practice of inadequately staffing the locations in the WCDC where at-risk detainees and inmates are permitted to be housed.

81.     Wicomico County and Director Kaloroumakis were aware of these deficiencies and failed to take effective remedial measures.

82.     Wicomico County has been on actual notice of these deficiencies since at least 2002, when the Department of Justice issued a report outlining, among other things:

   a. That Wicomico County must perform mental health screening on inmates/detainees within 24 hours of processing;

   b. That, regarding inmates at risk for self-harm, Wicomico County must implement a mental health treatment plan prepared by mental health professionals; and

   c. That Wicomico County must provide and document the appropriate prescription of medicine to treat mental illness.

83.     Wicomico County and Director Kaloroumakis acted with deliberate

indifference in creating and implementing these policies and in failing to remedy known deficiencies.

84.     As a direct and proximate result, Mr. Gosier was subjected to physical pain, mental anguish, emotional distress and death.

85.     Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against all Defendants, jointly and severally, as follows: (1) for compensatory damages in the amount of $5,000,000.00, which amount shall be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted under 42 U.S.C. § 1988; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

**COUNT II**
**Due Process – Article 24 of the Maryland**
**Declaration of Rights**
**All Defendants**

86.     The allegations in paragraphs 1 through 85 are incorporated by reference as though fully set forth herein.

87.     At all relevant times, Defendants acted under color of the laws of the State of Maryland.

88.     All actions of Defendants occurred within the course of their duty and the scope of their employment and/or agency as employees of Wicomico County or as employees contracted to act on their behalf and Maryland's constitution and its principles of respondeat superior liability impose an affirmative obligation on counties and

municipalities to avoid constitutional violations by their employees and contract-employees through, inter alia, adequate training and supervision and by discharging or disciplining negligent or incompetent employees/contract employees.

89.    The Defendants deprived Mr. Gosier of his life and liberty in violation of Article 24 of the Maryland Declaration of Rights when they knowingly failed to provide Mr. Gosier with necessary medical care including access to the appropriate medication, knowingly failed or refused to enforce a legitimate suicide watch policy, knowingly placed Mr. Gosier at an increased risk for suicidal ideation when placing him in "lockdown", knowingly failed to monitor him while he was suicidal, and knowingly failed to take steps to maintain his well-being, and thereby facilitated Mr. Gosier's suicide.

90.    The Defendants failure to conduct an actual suicide watch wherein the Defendants regularly monitored Mr. Gosier, coupled with their failure to medicate Mr. Gosier was malicious and with deliberate indifference and conscious disregard of Mr. Gosier's safety and welfare because Defendants knew that Mr. Gosier was suicidal and they knew that placing a suicidal detainee in "lockdown" without necessary medication and mental treatment would lead to his suicide.

91.    The Defendants actions and omissions facilitated Mr. Gosier's suicide and thus deprived Mr. Gosier of his life and liberty as guaranteed by Article 24 of the Maryland Constitution.

92.    Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against Defendants jointly and severally as follows: (1) for compensatory damages in the amount

of $5,000,000.00, which amount shall be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

**COUNT III**
**Negligence**
**Defendants Wicomico County,**
**Kaloroumakis, Byrd, O'Day,**
**Carroll, and John Does 1-25**

93.     The allegations in paragraphs 1 through 92 are incorporated by reference as though fully set forth herein.

94.     Defendants Wicomico County, Kaloroumakis, Byrd, O'Day, Carroll, John Does 1-25, at all relevant times, had a duty under the Eighth and Fourteenth Amendments to the United States Constitution, the Maryland Declaration of Rights, and common law, to: provide detainees and inmates at WCDC with reasonable care in accordance with the standards of delivery of such care in the State of Maryland; institute policies that would maintain prisoner/detainee well-being at the WCDC; enforce policies that would maintain prisoner/detainee well-being at the WCDC; monitor suicidal prisoners and detainees at WCDC; and provide timely and appropriate medication to suicidal prisoners and detainees at the WCDC.

95.     Wicomico County and/or Kaloroumakis further had a duty to hire, train, and/or supervise their employees/agents to meet their duties.

96.     Through the acts/omissions described in this complaint, specifically in paragraphs 75 through 81, Defendants, through negligence and/or gross negligence,

breached their duties to Mr. Gosier.

97.     As a foreseeable, direct, and proximate result, Mr. Gosier experienced extreme mental and physical pain and anguish prior to his death.

98.     Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against Defendants jointly and severally as follows: (1) for compensatory damages in the amount of $5,000,000.00, which amount shall be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

**COUNT IV**
**Wrongful Death**
**Defendants Wicomico County,**
**Kaloroumakis, Byrd, O'Day,**
**Carroll, and John Does 1-25**

99.     The allegations in paragraphs 1 through 98 are incorporated by reference as though fully set forth herein.

100.     Pursuant to Md. Courts & Judicial Proceedings §3-904, Donna Malone, Mr. Gosier's mother, brings this action for the wrongful death of her son.

101.     Defendants Wicomico County, Kaloroumakis, Byrd, O'Day, Carroll, John Does 1-25, at all relevant times, had a duty under the Eighth and Fourteenth Amendments to the United States Constitution, the Maryland Declaration of Rights, and common law, to: provide detainees and inmates at WCDC with reasonable care in accordance with the standards of delivery of such care in the State of Maryland; institute policies that would

maintain prisoner/detainee well-being at the WCDC; enforce policies that would maintain prisoner/detainee well-being at the WCDC; monitor suicidal prisoners and detainees at WCDC; and provide timely and appropriate medication to suicidal prisoners and detainees at the WCDC.

102.   Wicomico County and/or Kaloroumakis further had a duty to hire, train, and/or supervise their employees/agents to meet their duties.

103.   Through the acts/omissions described in this complaint, specifically in paragraphs 75 through 81, Defendants, through negligence and/or gross negligence, breached their duties to Mr. Gosier.

104.   The breaches described herein were knowing and deliberately indifferent to Mr. Gosier's well-being and as such, were motivated by malice, deliberate indifference, and conscious disregard for Mr. Gosier.  These failures facilitated Mr. Gosier's death.

105.   As a foreseeable, direct, and proximate result of Defendants' breaches, Mr. Gosier committed suicide while detained at WCDC and Ms. Malone has been caused and will continue to experience extreme mental anguish, emotional pain and suffering, loss of companionship, loss of comfort, and loss of love resulting the tragic and unnecessary death of her son, Thomas Gosier.

106.   Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against the Defendants jointly and severally as follows: (1) for compensatory damages in the amount of $1,222,500, which amount shall be proven at trial; (2) for punitive damages to the fullest extent permitted by law; and (3) for such other and further relief as this Court may deem

just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial in this action.

Date: August 21, 2019

Respectfully Submitted,

/s/ *Nicholas C. Bonadio*

Jay D. Miller (Bar No. 04653)
jmiller@lawpga.com
Nicholas C. Bonadio (Bar No. 13679)
nbonadio@lawpga.com
Thomas W. Keilty, III (Bar No. 18992)
tkeilty@lawpga.com
Law Offices of Peter G. Angelos, P.C.
100 N. Charles St. 22nd Floor
Baltimore, Maryland 21201
Phone: 410-649-2000
Facsimile: 410-649-2151
*Attorneys for Plaintiffs*
