IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| DONNA LYNN MALONE | * | Case No. 1:19-cv-02412-SAG |
| Individually and as Administrator of the | * | |
| Estate of THOMAS ALAN GOSIER | * | |
| 257 Seneca Drive, Apt. 2W | * | |
| Syracuse, New York 13205 | * | |
| | * | |
|     and | * | |
| | * | |
| To The Use Of: Daniel Gosier | * | |
|     Address Unknown | * | |
| | * | |
| | * | **Jury Trial Demanded** |
|     Plaintiffs, | * | |
| | * | |
| vs. | * | |
| | * | |
| WICOMICO COUNTY MARYLAND | * | |
|     Serve: Bob Culver | * | |
|     Wicomico County Executive | * | |
|     125 N. Division St. Room 303 | * | |
|     PO Box 870 | * | |
|     Wicomico County | * | |
| | * | |
|     and | * | |
| | * | |
| CONMED, LLC, a division of | * | |
| WELLPATH, LLC f/k/a CORRECT | * | |
| CARE SOLUTIONS, LLC | * | |
|     Serve on: | * | |
|     Corporate Creations Network, Inc. | * | |
|     #700, 2 Wisconsin Circle | * | |
|     Chevy Chase, Maryland 20815 | * | |
|     Anne Arundel County | * | |
| | * | |
|     Defendants. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiffs Donna Malone, Individually, and as Administrator of the Estate of her deceased son, Thomas Alan Gosier, and use plaintiff Daniel Gosier allege as follows:

1.      This is an action arising out of the death of twenty-two-year-old Thomas Gosier while in the custody of the Wicomico County Department of Corrections. By the deliberate indifference and gross negligence or negligence of Wicomico County, and the employees and/or agents of Wicomico County and/or Wicomico County Detention Center, Thomas Gosier, while suffering from extreme mental illness and the destructive symptoms of drug withdrawal, and after one desperate attempt to commit suicide while detained, was placed in solitary confinement with unrestricted access to implements the Defendants knew could be – and often were – used by detainees to commit suicide. On 21 August 2016, as a direct and foreseeable result of the Defendants' conduct, Thomas Gosier used his bed sheets to tie a noose around his neck and hang himself from the top bunk in his cell. Although still alive when he was found, Mr. Gosier never regained neurological function and was pronounced dead the following day.

## PARTIES

1.      Plaintiff Donna Lynn Malone is, and at all times relevant has been, a resident of Syracuse, New York. Ms. Malone is the mother of decedent Thomas Alan Gosier and was appointed Administrator of his estate on April 16, 2018. A copy of the Certificate of Appointment issued by the Surrogate's Court of Onondaga County New York is attached hereto as Exhibit A.

2.      Use Plaintiff Daniel A. Gosier is the biological father of the decedent Thomas Alan Gosier. Daniel A. Gosier's current whereabouts are unknown. Both Ms. Malone and

her attorneys have undertaken substantial – albeit unsuccessful – efforts to locate Daniel Gosier. As a result, the Surrogate's Court for the State of New York, Onondaga County dispensed with service of process for purposes of administering Thomas Gosier's estate. A copy of this complaint was sent to Daniel Gosier's last known address.

3.      Defendant Wicomico County is an entity of local government of the State of Maryland that, by virtue of the Maryland Constitution and the Wicomico County Charter, is a body corporate and politic that possess the rights of self-government and home rule. Wicomico County owns, and through its Department of Corrections, operates the Wicomico County Detention Center ("WCDC"). Wicomico County was, at all relevant times, responsible for the policies, practices, customs, and regulations governing and used at WCDC and for the misconduct, acts, and omissions of its employees, agents, and/or servants. Wicomico County was given notice of this claim pursuant to Md. Code Ann., Cts. & Judicial Proc. § 5-304 on or about November 28, 2016. A copy of the letter is attached hereto as Exhibit B

4.      At all relevant times, Otha Byrd, Jr. ("Byrd"), Robert O'Day ("O'Day"), James Bare ("Bare"), Doretha Carroll ("Carroll"), and Charles Ennis ("Ennis") were correctional officers employed by Defendant Wicomico County at WCDC, and were acting within the scope of their employment and under color of law.

5.      Upon information and belief, Defendant Conmed, LLC f/k/a Conmed, Inc. ("Conmed") is a Maryland Limited Liability Company that provides healthcare services to detainees through contracts with individual correctional facilities.

6.      Upon information and belief, Conmed was acquired by Correct Care

Solutions, LLC ("CCS") in 2012 and then CCS was acquired by Wellpath, LLC ("Wellpath") in 2019. Conmed and CCS are wholly owned subsidiaries of Wellpath.

7.      Upon information and belief, Conmed, CCS, and Wellpath operate as one business unit and, collectively, contracted with Wicomico County, through its Department of Corrections, to provide healthcare to detainees at WCDC, including Mr. Gosier.

8.      Hereinafter, Conmed, CCS, and Wellpath are collectively referred to as Defendant Conmed.

9.      At all relevant times, Michelle Gwaltney ("Gwaltney"), Jarvia Fishell ("Fishell"), and Johannes Dalmasy ("Dalmasy") were employees of Conmed acting within the scope of their employment and under color of law as expressly designated agents of Wicomico County.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, as this case involves question of federal law, and, as to the remaining claims, pursuant to 28 U.S.C. §1367.

11.     All Defendants either reside in, are employed in, or conduct substantial business in Wicomico County, Maryland and all the tortious acts or omissions giving rise to the claims asserted herein were committed in Maryland. Venue is therefore proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## FACTS

Arrest and Initial Detention

12.     Upon information and belief, Thomas Alan Gosier suffered from bipolar

disorder and/or schizophrenia, as well as a crippling addiction to drugs of abuse.

13.     In the early evening of August 12, 2016, PFC Barkley, an officer with the Salisbury Police Department, responded to a call reporting an alleged theft that occurred at a Giant grocery store in Salisbury, Maryland.

14.     The Giant store manager alleged that he witnessed Mr. Gosier stuff numerous items into his pockets and attempt to leave without paying.

15.     When confronted, Mr. Gosier allegedly left the store and threw the items into a nearby storm drain.

16.     PFC Barkely reported that he retrieved several bottles of Benzedrex nasal spray, with a cumulative value of $47.92, from the storm drain.

17.     It is widely understood, particularly among law enforcement, that individuals that suffer from drug addiction target Benzedrex because it is an over-the-counter product that, when abused, mimics the high achieved from abusing amphetamines.

18.     Upon being placed under arrest, despite the relatively unserious nature of his crime, Mr. Gosier became emotionally erratic and frenzied in the rear of the police car. Mr. Gosier thrashed around the inside of the vehicle, purposefully slamming his head into the rear window and desperately expressing his intent to commit suicide.

19.     Recognizing Mr. Gosier's mental instability, PFC Barkley executed a Petition for Emergency Evaluation under Md. Health General § 10-620 *et seq* and transported Mr. Gosier to Peninsula Regional Medical Center ("PRMC") for evaluation.

20.     PFC Barkley noted in the Petition that Mr. Gosier's suicidal ideations were accompanied by talk of multiple suicide attempts in the past and that Mr. Gosier was

currently was currently prescribed multiple antipsychotic medications (Risperdal and Zypraxin [sic]) to treat his mental health disorders.

21.     At PRMC, Mr. Gosier was examined by Elizabeth Townsend and emergency medicine physician Dr. William Wild ("Dr. Wild"), a member of Emergency Services Associates.

22.     Along with Defendant Conmed, PRMC, Elizabeth Townsend, Dr. Wild, and Emergency Service Associates are defendants in a parallel action for medical malpractice filed in Maryland Healthcare Alternative Dispute Resolution Office.

23.     Dr. Wild met with Mr. Gosier for approximately ten minutes before concluding, despite all evidence to the contrary, that Mr. Gosier was not an acute suicide risk.

24.     On information and belief, Dr. Wild failed to consider Mr. Gosier's mental illness and failed to consult with a licensed mental health professional.

25.     Just twenty-three minutes after arriving at PRMC, Mr. Gosier was discharged back into the custody of the Salisbury Police Department ("SPD") with a diagnosis of depression.

26.     Dr. Wild's discharge instructions did, however, instruct WCDC to return Mr. Gosier to the hospital for treatment if he expressed further suicidal ideation.

27.     After discharge from PRMC, Mr. Gosier was transported to WCDC, where he was processed into custody pending an appearance before a District Court Commissioner.

28.     During intake, Gosier's inclination to harm himself was noted by

Correctional Officer Verdus Humphries.

29.     A District Court Commissioner set Mr. Gosier's bail at $10,000, and Mr. Gosier was then placed into a holding tank within the Central Booking Post of WCDC.

30.     Mr. Gosier was thereby placed into the complete custody, control, care and protection of Defendant WCDC and its employees and/or agents who were at all relevant times acting within the scope of their employment and/or agency with Wicomico County, Maryland, and acting under color of law.

31.     Less than an hour after his bail was set, while still in a holding cell, Mr. Gosier against expressed suicidal thoughts, going so far as to assert that he would accomplish his suicide by shredding a mattress, and warning the WCDC staff that he had attempted suicide this way before.

32.     After being handcuffed to a bench, Mr. Gosier became emotionally agitated, pacing back and forth, refusing orders to sit down, and then attempted to rip a phone from the wall.

33.     Mr. Gosier was restrained and placed in a cell in the Medical Unit of WCDC on Suicide Watch.

34.     Upon information and belief, suicide watch requires precautions including, but not limited to, constant video surveillance, regular checks by correctional officers, and property restrictions. The property restrictions include provision of only a single cot or bunk that is low to the ground and equipped with an unbreakable plastic mattress. Prisoners on suicide watch are also denied access to bedding.

35.     Upon information and belief, these policies are applied to detainees on

suicide watch because the Defendants have actual knowledge that failing to take said precautions substantially increases the risk of suicide by detainees determined to be at risk.

Suicide Attempt on 13 August

36.    Mr. Gosier's mental and physical state was so desperate, however, that he attempted to "overcome" suicide watch. On 13 August 2016, after just an hour on suicide watch, Mr. Gosier tore the cover from his "suicide" mattress and wrapped it around his neck in an apparent attempt to asphyxiate himself.

37.    Upon information and belief, because Mr. Gosier was under constant monitoring – as part of the suicide watch protocol – WCDC correctional officers were able to thwart his attempt.

38.    This attempt put all Defendants on actual and express notice that Mr. Gosier was not simply seeking attention by threatening suicide – he was willing and able to go to great lengths to harm himself despite being arrested for "petty" theft.

39.    The Defendants failed, however, to provide Mr. Gosier with the medical care and institutional support to which he was entitled under the U.S. Constitution.

40.    In fact, although Gwaltney, a licensed practical nurse, executed an "urgent" staff referral for Mr. Gosier to see a mental health professional, Mr. Gosier was denied mental health services and the prescription medication required to treat his mental illness and regulate his erratic behavior. Instead, he was handcuffed and shackled to a gurney for approximately the next five hours before he was returned to a suicide watch cell.

Suicide Attempt on 14 August

41.    Less than 24 after the 13 August suicide attempt, correctional officers

watched again as Mr. Gosier tore the lining from his suicide mattress, fashioned a noose, and attempted to commit suicide by asphyxiation.

42.     Again, however, because he was under constant monitoring, WCDC employees were able to intervene. On this occasion, however, Mr. Gosier resisted intervention, and continued to tighten the makeshift noose around his neck by twisting it around the toilet in his cell.

43.     Correctional Officer Byrd utilized pepper spray to subdue Mr. Gosier long enough to cut the noose from around his neck and then Dr. Dalmasy apparently approved a "calming shot" to further de-escalate the situation.

<u>15 August Treatment and Disciplinary Charges</u>

44.     On the following day, approximately seventy-two hours after his arrest, forty-eight hours after Gwaltney's "urgent" referral to mental health, and after two suicide attempts, Mr. Gosier was evaluated by Jarvia Fishell, a licensed clinical professional counselor.

45.     Mr. Gosier was not seen by a psychiatrist and not returned to Peninsula Regional Medical Center as directed in Dr. Wild's discharge instructions.

46.     Fishell performed a "Suicide Watch Initial Assessment" and "Behavioral Health and Psychiatry Individual Assessment and Treatment Plan."

47.     Fishell noted Mr. Gosier's family history of schizophrenia, opiate and alcohol abuse/withdraw, impulsivity, the danger of his "giving up." Fishell classified Mr. Gosier as being at "high" risk for self-harm/suicide.

48.     Fishell indicated that Mr. Gosier should remain on suicide watch.

49.     Upon information and belief, just after this evaluation, after two suicide attempts in the previous forty-eight hours, twenty-four consecutive hours handcuffed and shackled to a gurney, and while still on suicide watch, WCDC staff served Mr. Gosier Notices of Infraction of at least ten WCDC rules.

50.     Each of these alleged infractions was committed either while expressing suicidal ideations or attempting suicide.

51.     Rather than provide Mr. Gosier with the treatment he needed, WCDC staff, including Byrd and Ennis, carrying out WCDC policies and procedures, disciplined Mr. Gosier for his "conduct" during multiple suicide attempts.

16 August Transfer to Disciplinary Lockdown

52.     Upon information and belief, Gosier was evaluated by Dr. Dalmasy, Conmed's Chief Psychiatric Officer, on 16 August at approximately 14:00 hours.

53.     Dr. Dalmasy approved orders to prescribe Gosier Vistaril and Zoloft.

54.     Rather than monitor the effect of these medications on Mr. Gosier's emotional and mental health, just thirteen minutes after the orders were signed, he was placed in disciplinary lockdown.

55.     It is well recognized that anti-depressants like Zoloft do not reach efficacy for one to three weeks yet before Gosier was given even one dose, he was removed from suicide watch and transferred to "F-Pod," where detainees are locked in a cell for 23 of 24 hours each day.

56.     That one hour of recreation, also carried out in isolation, allowed Gosier to roam an interior common area not more than 200 square feet. The only recreational

"activity" afforded detainees on "F-Pod" is a small television in the common area.

57.     Mr. Gosier was suffering from severe mental illness and opiate withdrawal and had attempted suicide multiple times in less than seventy-two hours before being transferred directly from suicide watch to solitary confinement.

58.     It is widely accepted that subjecting prisoners to prolonged periods of solitary lockdown – particularly those with a history of mental health disorders and/or drug addiction – substantially increases the incidence of suicidal ideation and the likelihood of suicide attempt.

<u>17-19 August Disciplinary Sentence and Suicidal Ideations</u>

59.     After twenty-four hours in solitary confinement, Master Correctional Officer Ennis presided over a "hearing" to adjudicate the alleged rules infractions committed by Gosier during his suicide attempts.

60.     Despite the recognition that Gosier was suffering from mental illness and opiate withdraw, and had attempted suicide multiple times, WCDC's disciplinary policies allowed for Mr. Gosier to be sentenced to forty consecutive days of solitary confinement in disciplinary segregation for the alleged rules infractions.

61.     Unsurprisingly, Mr. Gosier's mental state deteriorated quickly during his isolation and, faced with such a barbaric punishment, he requested to see a mental health professional the following day, but was told by WCDC staff that it would be an additional day before he was provided access to care.

62.     Mr. Gosier responded by expressing additional suicidal ideations and, at was transferred back to the Medical Pod and placed on suicide watch.

63.     While on suicide watch, Mr. Gosier desperately tried to express that he was unable to cope with the prospect of forty days in solitary confinement but Gwaltney, performing a "Pre-Segregation Health Evaluation" (more than two days after Mr. Gosier was initially transferred), indicated that Mr. Gosier had not expressed any concern about his ability to cope in the segregation unit.

64.     Upon information and belief, Gwaltney was, at all relevant times, a licensed practical nurse, unqualified to render judgments about Mr. Gosier's mental fitness for confinement.

65.     After twenty-four hours, and no adjustment to any treatment plan, Mr. Gosier was placed back in segregation to continue his sentence.

66.     The following day, on 19 August, Mr. Gosier again desperately reached out for help, telling a correctional officer that he felt his life was in danger. He was dismissed.

67.     Later the same day, Mr. Gosier feigned chest pains but was ignored.

68.     Just a few minutes after the "chest pains," Mr. Gosier claimed he swallowed a razor, all the while knowing that he did not have access to a razor.

69.     Despite these obvious cries for help, Mr. Gosier was denied access to meaningful mental health care after being returned to solitary confinement on 18 August.

70.     Compounding the relentless toll of solitary confinement on Mr. Gosier's mental state, the disciplinary cells on "F-Pod" gave him full access to a standard mattress and bedding, as well as a top bunk. As evidenced by the denial of these comforts to detainees on suicide watch, Defendants were acutely aware that such access provided mental ill detainees with the means to commit suicide by hanging.

71.     In addition to the means, the Defendants provided Mr. Gosier with the substantial opportunities to harm himself. While on "F-Pod," correctional officers are unable to perform constant video surveillance of detainees inside their cells and, even though Mr. Gosier was placed on "welfare watch," he was only checked on by correctional officers every twenty minutes, significantly less often than detainees on suicide watch.

72.     From Mr. Gosier's cell, he could even see a clock in the hallway outside "F-Pod," so he knew exactly how long he had before the next welfare check. Given that most detainee suicides take less than five minutes, and that his "F-Pod" cell contained the necessary implements, Defendants provided Mr. Gosier with all he needed to commit suicide successfully.

73.     On 21 August 2016, at approximately 12:38 hours, Correctional Officers O'Day and Bare entered "F-Pod" to complete cell checks, presumably including Mr. Gosier's welfare check.

74.     After O'Day and Bare exited "F-Pod," the only surveillance of Mr. Gosier's cell was by Correctional Officer Carroll looking at the display of a camera located in the common area of the pod. The camera looked at the small rectangular window of Mr. Gosier's cell from a severe angle, rendering Carroll unable to discern any activity inside.

75.     At approximately 12:44 hours, Mr. Gosier applied two lengths of toilet paper to the window in the door to his cell, obscuring all view of his actions inside.

76.     On information and belief, any coverage of this window was prohibited, in part because it may provide detainees an opportunity for self-harm completely out of the view of any WCDC staff.

13

77.     At some point thereafter, Carroll notified O'Day "through a small window" that Mr. Gosier had covered the window to his cell.

78.     Mr. Gosier's cell window was covered for approximately ten minutes before O'Day and Bare re-entered "F-Pod."

79.     Although O'Day and Bare were presumably responding to Carroll's report that Mr. Gosier's window was covered, O'Day took the opportunity to complete his normal check of all seven cells.

80.     After checking Cell 1, which consists of scanning the receiver on the cell door with his handheld computer, O'Day approached Cell 2, where Mr. Gosier was in the process of hanging himself from his bunk behind only the cover of two lengths of toilet paper. Despite the clear danger indicated by a mentally ill patient with suicidal ideations covering his cell window, and after calling out to Gosier and receiving no response for approximately sixteen seconds, O'Day consciously disregarded Gosier's welfare and carried out his normal check of the remaining cells on "F-Pod."

81.     After deliberately scanning the receivers on the doors of Cells 3, 4, 5, 6, and 7, O'Day returned to Mr. Gosier's cell door at approximately 12:55:09 hours. Again unable to elicit a response from Mr. Gosier, O'Day casually instructed the detainee from Cell 5, then out on recreation time, to return to his cell.

82.     It was not until approximately 12:55:30 hours, eleven and a half minutes after he covered the window to his cell, that Carroll opened Mr. Gosier's cell door.

83.     Upon entering Mr. Gosier's cell, Correctional Officers O'Day and Bare observed Mr. Gosier hanging from the top bunk, with a bedsheet fashioned into a noose

14

and wrapped tightly around his neck. According to Bare, Mr. Gosier was gasping for breath, with mucus excreting from his nose and mouth.

84.     Bare and O'Day were able to cut Mr. Gosier from the makeshift noose and call for medical assistance. After WCDC staff performed CPR for a period of time, Mr. Gosier was transported by ambulance to PRMC.

85.     Multiple doses of epinephrine resulted in Mr. Gosier regaining a pulse but he never regained any signs of neurological function. Mr. Gosier was pronounced dead on 22 August 2016 at 17:14 hours.

## COUNT I
## 42 U.S.C. § 1983
## Wicomico County

86.     The allegations in paragraphs 1 through 85 are incorporated by reference as though fully set forth herein.

87.     This Count arises under 42 U.S.C. § 1983, and is alleged against Wicomico County for its actions, inactions, supervision, or supervisory directives, carried out through WCDC, causing and/or knowingly acquiescing in personnel's decision to refuse to safeguard Thomas Gosier, thereby causing the deprivation of Mr. Gosier's constitutional rights to personal security and protection under the Fourteenth Amendment to the Constitution.

88.     Under the Eighth and Fourteenth Amendments to the United States Constitution Wicomico County owed a duty of care to Mr. Gosier to provide him with medical care in accordance with the standards of delivery of such care in the State of Maryland; institute and enforce policies that would maintain his well-being while in the

custody of Wicomico County; monitor him, and provide him with timely and appropriate medication.

89.     Mr. Gosier was at all times a pre-trial detainee at WCDC and was therefore owed the protections of due process of law pursuant to the Fourteenth Amendment to the U.S. Constitution. Detainees and inmates are constitutionally entitled to detention in an environment that offers reasonable protection from harm.

90.     At all relevant times, WCDC had actual knowledge that Thomas Alan Gosier:

>    a.  Suffered from severe mental illness including, but not limited to, bipolar disorder and schizophrenia;
>
>    b.  Suffered from drug addiction at the time of his arrest and detention;
>
>    c.  Was suffering from the physical effects of drug withdrawal during his detention;
>
>    d.  Had a history of suicidal ideation and suicide attempts;
>
>    e.  Had recently expressed suicidal ideations and attempted suicide during his detention;
>
>    f.  His recent expressions of suicidal ideations and attempted suicide occurred in response to facing a minor criminal charge of theft under $50; and
>
>    g.  Made erratic and irrational statements in an attempt to be removed from solitary confinement.

91.     At all relevant times, WCDC knew that each of the facts listed in the previous paragraph are clear indicators that a detainee is at substantial risk for self-harm.

92.     WCDC also knew that detainees in pre-trial confinement, including Mr. Gosier, are far more likely to attempt suicide than inmates serving a prescribed sentence.

93.     WCDC was therefore acutely aware that Mr. Gosier was at extreme risk for self-harm.

94.     Despite this knowledge, among other things:

   a.   WCDC created and implemented disciplinary policies allowing for suicidal inmates to be charged with rules infractions, and punished for, attempting suicide;

   b.   WCDC created and implemented disciplinary policies allowing for suicidal inmates to be housed in solitary confinement, a housing condition widely known to increase the likelihood of inmate suicide;

   c.   WCDC created and implemented policies allowing for suicidal inmates to be denied access to mental health care with a psychiatrist for reasons of convenience;

   d.   WCDC created and implemented policies allowing for suicidal inmates to be placed into solitary confinement prior to sufficient treatment and/or monitoring after a mental health crisis;

   e.   WCDC created and implemented policies delegating the pre-segregation health evaluation of suicidal inmates to licensed practical nurses that are unqualified to render judgments about complex health issues;

   f.   WCDC failed to implement policies requiring and/or failed to adequately train its employees to adhere to discharge instructions rendered by outside

17

health care providers when detainees receive evaluation and/or treatment prior to detention;

g.  WCDC failed to implement policies requiring that correctional officers responsible for carrying out welfare watch checks be informed of an inmate's history of, and predisposition to, suicide and/or self-harm;

h.  WCDC failed to implement policies restricting access to property, including top bunks and standard bedding, by suicidal inmates;

i.  WCDC failed to adequately train its employees to identify and react to suicidal detainees/inmates; and

j.  WCDC consciously and deliberately entrusted the physical and mental healthcare of detainees/inmates to Conmed with actual and/or constructive knowledge that Conmed would delegate complex medical decision-making to unqualified individuals and otherwise deny appropriate care to detainees/inmates.

95.     WCDC committed the acts and omissions in the previous paragraph with deliberate indifference toward Mr. Gosier and intentional disregard for his physical and mental health.

96.     The violations of Mr. Gosier's civil rights as well as the deliberate indifference and reckless disregard to Mr. Gosier's and similarly situated detainees' and detainees' medical needs and safety were the direct and proximate results of the customs, policies, and practices of Wicomico County.

97.     Wicomico County expressly or tacitly encouraged, ratified, and/or approved

of the acts and/or omissions alleged herein, and knew or should have known that such conduct was unjustified and would result in violations of Constitutional rights.

98.     These customs, policies, and practices constituted standard operating procedures at WCDC.

99.     Wicomico County was aware of these deficiencies and failed to take effective remedial measures.

100.     Wicomico County has been on actual notice of these deficiencies since at least 2002, when the Department of Justice issued a report outlining, among other things:

    a.  That Wicomico County must perform mental health screening on inmates/detainees within 24 hours of processing;

    b.  That, regarding inmates at risk for self-harm, Wicomico County must implement a mental health treatment plan prepared by mental health professionals; and

    c.  That Wicomico County must provide and document the appropriate prescription of medicine to treat mental illness.

101.     Wicomico County acted with deliberate indifference in creating and implementing these policies and in failing to remedy known deficiencies.

102.     As a direct and proximate result, Mr. Gosier was subjected to physical pain, mental anguish, emotional distress and death.

Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against Wicomico County as follows: (1) for compensatory damages in the amount of

$5,000,000.00, which amount shall be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted under 42 U.S.C. § 1988; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

**COUNT II**
**42 U.S.C. § 1983**
**CONMED**

103.    The allegations in paragraphs 1 through 102 are incorporated by reference as though fully set forth herein.

104.    Conmed, through its employees, including Gwaltney, Fishell, and Dalmasy, acted with deliberate indifference to Mr. Gosier's known mental health needs, depriving him of his constitutional rights to personal safety and protection under the Eight and/or Fourteenth Amendments to the United States Constitution.

105.    Each of the individual health care providers employed by Conmed, at the time of their omissions, knew that that Thomas Alan Gosier:

    a.  Suffered from severe mental illness including, but not limited to, bipolar disorder and schizophrenia;

    b.  Suffered from drug addiction at the time of his arrest and detention;

    c.  Was suffering from the physical effects of drug withdrawal during his detention;

    d.  Had a history of suicidal ideation and suicide attempts;

    e.  Had recently expressed suicidal ideations and attempted suicide during his detention;

f.  His recent expressions of suicidal ideations and attempted suicide occurred in response to facing a minor criminal charge of theft under $50; and

g.  Made erratic and irrational statements in an attempt to be removed from solitary confinement.

106.  At all relevant times, Conmed knew that each of the facts listed in the previous paragraph are clear indicators that a detainee is at substantial risk for self-harm.

107.  Conmed also knew that detainees in pre-trial confinement, including Mr. Gosier, are far more likely to attempt suicide than inmates serving a prescribed sentence.

108.  Conmed was therefore acutely aware that Mr. Gosier was at extreme risk for self-harm.

109.  Despite this knowledge, among other things:

a.  Gwaltney and/or Fishell dismissed Mr. Gosier's suicide attempts as "not real" attempts;

b.  Gwaltney, Fishell, and/or Dalmasy approved Mr. Gosier's transfer from suicide watch to disciplinary segregation with full knowledge that he had not received adequate treatment;

c.  Gwaltney, Fishell, and/or Dalmasy failed to recommend that Mr. Gosier be denied access to personal property, including bedding and bunk beds, that they knew could be used as implements in a suicide attempt;

d.  Gwaltney, Fishell, and/or Dalmasy failed to adequately respond to Mr. Gosier's stated inability to cope with solitary confinement;

e.  Conmed delegated pre segregation health screening to Gwaltney, a licensed

21

practical nurse, who was wholly unqualified to make complex medical decisions;

f.  Gwaltney, Fishell, and/or Dalmasy deliberately failed to follow the discharge instructions provided by Peninsula Regional Medical Center that directed Mr. Gosier's return to the hospital if he displayed any further signs of suicidal ideation; and

g.  Defendant Conmed, by and through its employees, Gwaltney, Fishell, and Dalmasy, consciously and deliberately ignored glaring clinical signs that Mr. Gosier was unfit for solitary confinement and required urgent medical attention.

110.   Defendants committed the acts and omissions in the previous paragraph with deliberate indifference toward Mr. Gosier and intentional disregard for his physical and mental health.

111.   Conmed, with full knowledge of Mr. Gosier's compromised mental state and the high likelihood of self-harm, left him in disciplinary lockdown instead of referring him for the urgent mental health care that he required.

112.   Conmed further failed to ensure that proper protocols were in place for evaluating and/or monitoring detainees/inmates at high risk for self-harm/suicide and ensuring that at-risk detainees were transferred to a facility equipped to provide the necessary care.

113.   The violations of Mr. Gosier's civil rights as well as the deliberate indifference and reckless disregard to Mr. Gosier's and similarly situated detainees' and

detainees' medical needs and safety were the direct and proximate results of the customs, policies, and practices of Conmed.

114.    Conmed expressly or tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, and knew or should have known that such conduct was unjustified and would result in violations of Constitutional rights.

115.    These customs, policies, and practices constituted standard operating procedures of Conmed.

116.    As a direct and proximate result of Conmed's deliberate indifference, Mr. Gosier was subjected to physical pain, mental anguish, emotional distress and death.

117.    At all times relevant to Conmed's deliberately indifferent acts and omissions, it was acting under color of state law.

Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against Conmed, as follows: (1) for compensatory damages in the amount of $5,000,000.00, which amount shall be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted under 42 U.S.C. § 1988; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

## COUNT III
### Due Process – Article 24 of the Maryland
### Declaration of Rights
### All Defendants

118.    The allegations in paragraphs 1 through 117 are incorporated by reference as

though fully set forth herein.

119.   At all relevant times, Defendants acted under color of the laws of the State of Maryland.

120.   All actions of Defendants occurred within the course of their duty and the scope of their employment and/or agency as employees of Wicomico County or as employees contracted to act on their behalf and Maryland's constitution and its principles of respondeat superior liability impose an affirmative obligation on counties and municipalities to avoid constitutional violations by their employees and contract-employees through, inter alia, adequate training and supervision and by discharging or disciplining negligent or incompetent employees/contract employees.

121.   The Defendants deprived Mr. Gosier of his life and liberty in violation of Article 24 of the Maryland Declaration of Rights when they knowingly failed to provide Mr. Gosier with necessary medical care including access to the appropriate medication, knowingly failed or refused to enforce a legitimate suicide watch policy, knowingly placed Mr. Gosier at an increased risk for suicidal ideation when placing him in "lockdown," knowingly failed to monitor him while he was suicidal, and knowingly failed to take steps to maintain his well-being, and thereby facilitated Mr. Gosier's suicide.

122.   The Defendants failure to conduct an actual suicide watch wherein the Defendants regularly monitored Mr. Gosier, coupled with their failure to properly medicate Mr. Gosier was malicious and with deliberate indifference and conscious disregard of Mr. Gosier's safety and welfare because Defendants knew that Mr. Gosier was suicidal and they knew that placing a suicidal detainee in "lockdown" without necessary medication

and mental treatment would lead to his suicide.

123.    The Defendants actions and omissions facilitated Mr. Gosier's suicide and thus deprived Mr. Gosier of his life and liberty as guaranteed by Article 24 of the Maryland Constitution.

Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against Defendants jointly and severally as follows: (1) for compensatory damages in the amount of $5,000,000.00, which amount shall be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

### COUNT IV
### Negligence
### Defendant Wicomico County

124.    The allegations in paragraphs 1 through 123 are incorporated by reference as though fully set forth herein.

125.    Defendant Wicomico County at all relevant times, had a duty under the Eighth and Fourteenth Amendments to the United States Constitution, the Maryland Declaration of Rights, and common law, to: provide detainees and inmates at WCDC with reasonable care in accordance with the standards of delivery of such care in the State of Maryland; institute policies that would maintain prisoner/detainee well-being at the WCDC; enforce policies that would maintain prisoner/detainee well-being at the WCDC; monitor suicidal prisoners and detainees at WCDC; and provide timely and appropriate

medication to suicidal prisoners and detainees at the WCDC.

126.   Wicomico County further had a duty to hire, train, and/or supervise their employees/agents to meet their duties.

127.   Through the acts/omissions described in this complaint, specifically in paragraphs 90 through 101, Wicomico County, through negligence and/or gross negligence, breached its duties to Mr. Gosier.

128.   As a foreseeable, direct, and proximate result, Mr. Gosier experienced extreme mental and physical pain and anguish prior to his death.

Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against Wicomico County as follows: (1) for compensatory damages in the amount of $5,000,000.00, which amount shall be proven at trial; (2) for reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) for punitive damages to the fullest extent permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

### COUNT V
### Wrongful Death
### Defendant Wicomico County

129.   The allegations in paragraphs 1 through 128 are incorporated by reference as though fully set forth herein.

130.   Pursuant to Md. Courts & Judicial Proceedings §3-904, Donna Malone, Mr. Gosier's mother, brings this action for the wrongful death of her son.

131.   Defendant Wicomico County, at all relevant times, had a duty under the

Eighth and Fourteenth Amendments to the United States Constitution, the Maryland Declaration of Rights, and common law, to: provide detainees and inmates at WCDC with reasonable care in accordance with the standards of delivery of such care in the State of Maryland; institute policies that would maintain prisoner/detainee well-being at the WCDC; enforce policies that would maintain prisoner/detainee well-being at the WCDC; monitor suicidal prisoners and detainees at WCDC; and provide timely and appropriate medication to suicidal prisoners and detainees at the WCDC.

132.    Wicomico County further had a duty to hire, train, and/or supervise their employees/agents to meet their duties.

133.    Through the acts/omissions described in this complaint, specifically in paragraphs 90 through 101, Wicomico, through negligence and/or gross negligence, breached its duties to Mr. Gosier.

134.    The breaches described herein were knowing and deliberately indifferent to Mr. Gosier's well-being and as such, were motivated by malice, deliberate indifference, and conscious disregard for Mr. Gosier.  These failures facilitated Mr. Gosier's death.

135.    As a foreseeable, direct, and proximate result of Defendants' breaches, Mr. Gosier committed suicide while detained at WCDC and Ms. Malone has been caused and will continue to experience extreme mental anguish, emotional pain and suffering, loss of companionship, loss of comfort, and loss of love resulting the tragic and unnecessary death of her son, Thomas Gosier.

Wherefore, Plaintiff Donna Malone, as personal representative of the Estate of Thomas A. Gosier, requests that the Court enter judgment in her favor and against

Wicomico County as follows: (1) for compensatory damages in the amount of $1,222,500, which amount shall be proven at trial; (2) for punitive damages to the fullest extent permitted by law; and (3) for such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial in this action.

Date: November 13, 2019

Respectfully Submitted,

/s/ *Nicholas C. Bonadio*

Jay D. Miller (Bar No. 04653)
jmiller@lawpga.com
Nicholas C. Bonadio (Bar No. 13679)
nbonadio@lawpga.com
Thomas W. Keilty, III (Bar No. 18992)
tkeilty@lawpga.com
Law Offices of Peter G. Angelos, P.C.
100 N. Charles St. 22nd Floor
Baltimore, Maryland 21201
Phone: 410-649-2000
Facsimile: 410-649-2151
*Attorneys for Plaintiffs*