IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **DONNA LYNN MALONE,** *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Case No. 19-2412-SAG |
| **WICOMICO COUNTY, MARYLAND,** *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs sued Defendants Wicomico County Maryland ("Wicomico") and Conmed, LLC ("Wellpath") following the suicide of Thomas Alan Gosier while in custody at the Wicomico County Detention Center ("WCDC"). Currently pending is Plaintiffs' Motion for Sanctions, ECF 60. I have reviewed the Motion, Defendants' Oppositions, ECF 67 and 69, and Plaintiffs' Reply, ECF 70. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, the Motion will be denied.

**I.   Analysis**

The alleged facts in this case are set forth in detail in this Court's earlier Memorandum Opinion, ECF 32, and will not be repeated herein. Relevant to the instant motion, however, Mr. Gosier died on August 21, 2016. On September 4, 2016, his mother, Donna L. Malone, messaged Wicomico to request that it preserve "the Video Types [sic] from dates 08/12/16 – 08/21/16." ECF 67-3. Days later, on September 9, 2016, an attorney for Malone sent a letter to Wicomico, misnaming the decedent as "Thomas Cosier" and requesting that Wicomico preserve:

> Any video or other recorded materials and/or any documents generated from the above referenced incident. Specifically, please preserve all such materials,

> including any information involving the officers responsible for watching Mr. Cosier's cell, related to the investigation into the death of Thomas Cosier; KGA tapes; calls for service; investigation, reports/documents; memoranda of any kind; fire department records; EMS records; witness reports, employee records; body cameras on the officers; patrol cars with video cameras; computer notes in cars, Internal Affairs files, (including but not limited to notes, memos, witness statements, photographs; police reports); booking information; witness statements; any and all documents related to the above referenced matter not specifically identified herein.

ECF 67-4. The letter states that it is intended to preserve "any and all claims that our client may have against the County of Wicomico, the Wicomico County Corrections Center, and related persons or entities in the above-referenced incident." *Id.* Roughly one month later, on October 4, 2016, the attorney sent a new letter correcting the misspelled name and again requesting preservation of the same collection of materials for the same purpose. ECF 67-5. Finally, on November 28, 2016, the attorney sent a third letter expressing an intent to sue "Wicomico County, its employees, agents and representatives, and any and all heretofore unidentified governments, agencies and/or individuals" for claims to include "negligence, gross negligence, and intentional wrongdoing include [sic], but are not limited to, assault, state and federal civil rights violations, and any and all other tort claims that may be discovered." ECF 67-7. The letter does not reference medical negligence, improper medical care, or any potential claims against the correctional facility's medical provider.

Three years exactly after Mr. Gosier's death, on August 21, 2019, Plaintiffs filed the instant action, naming as defendants Wicomico, seven WCDC employees, Wellpath, and "John and Jane Does 1-25." ECF 1. Wellpath first learned of the action upon receiving service. Eventually, in the course of discovery, Plaintiffs requested email correspondence between a number of Wellpath employees and Wicomico. However, in February, 2019, Wellpath had instituted a new nationwide email retention policy which led to the destruction of millions of emails not known to be preserved

2

in connection with pending litigation. The emails Plaintiffs eventually requested in this litigation had largely been destroyed pursuant to the email retention policy.

Plaintiffs deem Wellpath's actions to be spoliation and request sanctions in the form of default judgment, partial summary judgment for Plaintiffs, and/or an adverse instruction at trial. ECF 60-1 at 19. They also seek similar sanctions against Wicomico for "for failing to notify Wellpath of [Malone's] intent to sue, and for failing to advise [Malone] that evidence potentially relevant to her allegations was in the control of Wellpath." ECF 60-1 at 3.

### a. Wicomico

Initially, Plaintiffs cite no authority under which this Court could impose spoliation sanctions on Wicomico. The preservation letter sent to Wicomico did not ask for ESI or emails to be preserved. Wicomico preserved the evidence requested in the preservation letter it received, did not destroy any evidence, and bore no obligation to notify Wellpath of Plaintiffs' intent to sue. In fact, Wicomico had no reason to know that Plaintiffs had an intent to sue Wellpath, as the correspondence written by Plaintiffs' counsel made no mention of any such intent or any actions taken by Wellpath employees. Instead, it focused on "the officers responsible for watching" Mr. Gosier's cell. ECF 67-4. It is true that under some circumstances, a preservation letter sent to Wicomico may have required it to request Wellpath to preserve certain information, because "'documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.'" *Goodman v. Praxair Services, Inc.*, 632 F. Supp. 2d 494, 515 (D. Md. 2009) (quoting *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007)). Plaintiffs suggest that this duty was implicated by virtue of the preservation letter's unspecific reference to federal civil rights claims, ECF 60-1 at 14-15, but such reasoning inappropriately transforms Wicomico's obligation to identify and preserve evidence that

is potentially relevant to anticipated litigation into a duty to construct alternate legal theories on Plaintiffs' behalf. Nothing in the course of Plaintiffs' correspondence with Wicomico suggested that it would be pursuing a federal civil rights claim implicating Wellpath at all, let alone its policies, customs, and emails specifically. Plaintiffs' focus was, instead, on the conduct of the Wicomico guards leading up to and on the day of Mr. Gosier's death. While it is not Plaintiffs' responsibility to lay out with precision its exact claims and the evidence that must be preserved in relation to them, it cannot expect Wicomico to extrapolate its broad and unspecific reference to federal civil rights claims to cover a separate health care provider's policies and customs, when nothing in Plaintiffs' course of correspondence could reasonably be read to have implicated Wellpath up to that point.

It is helpful to briefly outline some simple steps Plaintiffs could have taken to successfully put Wicomico on notice of "specific, predictable, and identifiable litigation" implicating its emails as well as Wellpath's policies and customs. Plaintiffs' counsel could, for example, have asked Wicomico to preserve its internal email communications or communications involving policies enacted by its medical provider. He did not. In the absence of any reference to the medical provider or to email communications, it is not reasonable to suggest that Wicomico had a duty to foresee that Plaintiffs' legal theories might encompass Wellpath's mental health care policies, or to predict the scope of discovery requests Plaintiffs might make years later.

### b. Wellpath

The spoliation analysis with respect to Wellpath, which did destroy certain email records, is somewhat different. Even the least drastic of Plaintiffs' three requested sanctions falls short, however. Trial courts have broad discretion to permit a jury to draw adverse inferences from a party's failure to present evidence, the loss of evidence, or the destruction of evidence. *Goodman*,

632 F. Supp. 2d at 520. However, the inference "requires a showing that the party knew the evidence was relevant to some issue at trial and that his wilful conduct resulted in its loss or destruction." *Id.* (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)). In *Thompson v. United States Housing and Urban Development*, this Court elucidated three requirements for an adverse instruction regarding spoliation of evidence:

> [B]ecause it is an extreme sanction, three things must be shown to warrant an adverse inference instruction for spoliation of evidence: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

219 F.R.D. 93, 101 (D. Md. 2003) (citations omitted).

Plaintiffs' contention fails at the first prong, because they offer no evidence that Wellpath had been advised of the potential claims against it before Plaintiffs' lawsuit was filed and served in August, 2019 or should have otherwise been aware of the potential for a lawsuit such that an obligation to preserve evidence attached. This case is readily distinguishable from the case Plaintiffs cite, *Estate of Moreno v. Correctional Healthcare Companies*, Civ. No. 4:18-CV-5171-RMP, 2020 WL 5740265 (E.D. Wa. June 1, 2020). In *Moreno*, the plaintiffs sent a preservation letter to Wellpath on January 4, 2018, directing Wellpath to "preserve all paper and electronic records that may be relevant to our clients' claims" including "all e-mails and other electronic and paper records regardless of where they are maintained." *Id.* at *2. The *Moreno* plaintiffs issued discovery requests to Wellpath on December 17, 2018, requesting various items including pertinent emails. Because Wellpath did not serve complete responses to those discovery requests, plaintiffs filed a series of motions to compel, beginning in February 2019 and stretching into the fall of that year. Eventually, the plaintiffs learned that in February 2019, Wellpath had

5

implemented its new nationwide document retention policy, which resulted in the destruction of millions of emails, including some that were relevant and responsive to the discovery requests pending in the *Moreno* case. The *Moreno* court found, "In summary, Defendants deleted an extensive amount of responsive ESI through the implementation of a new document retention policy, long after receiving a letter requesting preservation of evidence and after receiving formal discovery requests from Plaintiffs." *Id.* at *4. On those facts, the Court found that Wellpath had engaged in wilful conduct and granted partial summary judgment for the plaintiffs.

The facts here, however, are starkly different. Plaintiffs sent no document preservation letter to Wellpath. The document preservation letter sent to Wicomico did not mention emails and did not mention Wellpath, its policies, or its employees. The litigation did not commence until months after Wellpath's implementation of its new email retention policy, so no formal discovery requests in this case were pending when the policy was enacted. In other words, Plaintiffs have no evidence that Wellpath knew it had an obligation to preserve emails, but wilfully destroyed them instead. Wellpath did maintain all of Mr. Gosier's medical records, including his mental health file, further suggesting that it did not intentionally destroy relevant evidence or have a culpable state of mind. Ultimately, in the absence of a record like that in *Moreno,* imposing any of Plaintiffs' requested sanctions would be entirely inappropriate. *Moreno* does not stand for the proposition that judgment should be entered for the plaintiffs in any case possibly affected by Wellpath's February 2019 email retention policy.

Recognizing, perhaps, the crucial differences between this case and *Moreno*, Plaintiffs point to several additional factors to suggest that Wellpath should have known to preserve its emails and other information related to its policies. They argue 1) that Wellpath's history of dealing with custodial patient civil rights lawsuits meant that "it knew that it was destroying

6

evidence potentially relevant to hundreds of forthcoming cases, including this one," and 2) that Wellpath's patient death-related policies were geared toward preparing for litigation such that it knew a lawsuit was likely. ECF 60-1 at 12-13. Plaintiffs rely exclusively on *Jenkins v. Woody*, 2017 WL 362475 (E.D. Va. January 21, 2017), as persuasive support for both propositions, but in *Jenkins* there existed a critical third factor missing here—the defendant's own admission under oath that "when people die in the jail, [it is] common for lawsuits to follow," which the *Jenkins* court deemed to be "especially" significant to its spoliation analysis. *Id.* at *14-15.

Even setting the missing admission aside, the circumstances in *Jenkins* bear little resemblance to this case. The *Jenkins* plaintiffs initially sought the information at issue via FOIA request a mere twenty-four days after the inmate's death, *id.* at *9—a sharp contrast to the three years that elapsed before Plaintiffs brought Wellpath into the litigation here. Moreover, *Jenkins* involved a single sheriff who was the defendant in at least ten different jail death cases in state and federal court in Richmond, arising out of his oversight of just two facilities. *Id.* at *9 n. 18, 19. The significant number of inmate death lawsuits in such a localized context makes an inference of knowledge of impending suit after yet *another* inmate death unsurprising. Here, by contrast, the many cases against Wellpath cited by Plaintiffs have in common only the fact that they involve custodial patient civil rights generally. Plaintiffs do not specify whether the cases involve prison deaths at all, nor do they indicate whether the cases arose out of the same region or facility as the one where Mr. Gosier died.[1] The fact that other plaintiffs across the country have sued Wellpath for prisoner civil rights violations in unspecified contexts says nothing about what the company

---

[1] Only two of the cases Plaintiff lists were brought in Maryland. *See* ECF 60-8. It is worth pointing out, too, that Wellpath operates over 500 centers in 33 states, treating more than 300,000 patients per day. *Divisions > Wellpath*, https://wellpathcare.com/divisions/ (last visited April 8, 2021). That the company has been frequently sued is unsurprising given the scale of its operations providing medical services to incarcerated individuals.

should have known regarding litigation prospects in the specific context of any prison death, let alone a prison death occurring in the particular facility at issue. Summed up in the simplest terms, the *Jenkins* court was able to infer that the sheriff knew or should have known to preserve the evidence because there existed a clear pattern of prison death lawsuits in his facilities. Plaintiffs attempt to stretch that reasoning out across cases that do not share a common factual underpinning (prison deaths) or geographic context (the same region or facility), which dilutes the Court's ability to find a *Jenkins*-like pattern of lawsuits that would, in turn, create the sort of discovery obligations Plaintiffs claim exist here.

It is also worth noting that the content of the missing emails in this case is entirely unknown. There is no evidence before the Court suggesting the subject matter covered by any emails touching on Mr. Gosier's medical condition or death, or any emails about policies affecting WCDC during the relevant period. Plaintiffs cite to the testimony of Jarvia Fishell, Wellpath's Mental Health Coordinator at WCDC, suggesting that she "regularly emailed her supervisor with policy and procedure questions." ECF 70 at 2. That quotation inaccurately summarizes Fishell's actual testimony, in which she said that she communicated with her supervisors in person, by email, and by phone, citing as an example of a possible topic she might discuss with a supervisor, "If there was something that I had a question about in terms of policy and procedure and I wasn't able to determine it myself or if it just wasn't clear for some reason." ECF 60-10 at 37:3-40:12. Her testimony does not establish, then, the prior existence of a trove of emails about Wellpath's policy and procedures in the relevant time frame. In the absence of either some knowledge of the content of the emails, or some evidence of wilful destruction by Wellpath, this Court cannot presume that the lost evidence would have supported Plaintiffs' claims.

Finally, Plaintiffs object to Wellpath's handling of its communications with the Court during the discovery process regarding the potential continued existence of responsive emails. Even inaccurate representations made during the course of a case do not constitute spoliation, and this Court is not inclined to parse every statement made by counsel to see whether counsel should have been clearer about what did and did not exist.  In the absence of some proffered statement clearly evidencing lack of candor to the Court, this Court sees no basis for imposition of sanctions.

## II.     Conclusion

For the reasons set forth above, Plaintiffs' Motion for Sanctions, ECF 44, is denied.  A separate Order follows.


Dated: April 8, 2021                                                        /s/
                                                                Stephanie A. Gallagher
                                                                United States District Judge