# PLAINTIFF'S EXHIBIT NO. 1

**Expert Report of Terry A. Kupers, M.D., M.S.P.**

**Re: Gosier v. WCDC et al. -- Case 1:19-cv-02412-SA**

## I.  Background and Qualifications

I am a board-certified psychiatrist, Institute Professor at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues.  I have testified more than thirty times in state and federal courts about the psychiatric effects of jail and prison conditions, the quality of correctional management and mental health treatment, and prison sexual assaults.  I have served as a consultant to the U.S. Department of Justice, Human Rights Watch and Disability Rights.   I am the author of <u>Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It</u> (Jossey-Bass/Wiley, 1998) and <u>Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It</u> (University of California Press, 2017), co-editor of <u>Prison Masculinities</u> (Temple University Press, 2001), and a Contributing Editor of <u>Correctional Mental Health Report</u>.  I have authored and co-authored dozens of professional articles and book chapters, including "A Community Mental Health Model in Corrections" in <u>Stanford Law & Policy Review</u>, 26, 119-158, Spring, 2015; and "The Asylum, The Prison and the Future of Community Mental Health," a chapter in *Community Mental Health: Challenges for the 21st Century*, Editors  Jessica Rosenberg and Samuel J. Rosenberg, New York & London: Taylor & Francis/Routledge, 2017.  I served as consultant to the Connections Program in San Francisco, California, a collaboration between San Francisco Court Case Managers, San Francisco Jail Mental Health Services and Community Mental Health agencies designed to provide alternatives to jail for mentally ill and substance-abusing offenders.  I have served as an expert witness in multiple class action lawsuits concerning the conditions of confinement in solitary confinement units, including *Jones 'El v. Litscher, Dockery v. Hall and Ashker v. Governor of California* (see *curriculum vitae*, Exhibit A).  I served as monitor of the *Presley v. Epps* consent decree (federal court) in Mississippi, involving inmates with mental illness in isolated confinement at Mississippi State Penitentiary.[1]  I was the recipient of the Exemplary Psychiatrist Award presented by the National Alliance on Mental Illness (NAMI) at the 2005 annual meeting of the American Psychiatric Association, and the William Rossiter Award for "global contributions made

---

[1] No. 4:05CV148-JAD (N.D. Mississippi, 2005 & 2007).

to the field of forensic mental health" at the 2009 Annual Meeting of the Forensic Mental Health Association of California.

I have been asked by Plaintiff's Counsel to review records and provide opinions about the management and mental health treatment of Mr. Thomas Gosier at the Wicomico County Detention Center.  My fee is $325 per hour for all work except testimony, and $500 per hour for testimony at deposition and/or trial.  My C.V., which includes a list of publications in the past ten years, and a list of cases where I have testified in the last four years are attached to this report as Exhibits A & B.

## II.  Testimony Preparation

I have reviewed the following documents:

1.  Plaintiffs First Amended Complaint;
2.  Defendant's Motion to Dismiss with accompanying exhibits, and Plaintiffs' Opposition;
3.  Thomas Gosier's Medical File, Wicomico Detention Facility/CCS
4.  Wellpath and Wicomico documents provided in response to Plaintiffs' Request for Production of Documents, including Wicomico County and Wellpath policies;
5.  Defendants' Answers to Plaintiff's Interrogatories
6.  U.S.D.O.J. Settlement Agreement Re Wicomico County Detention Center, July 6, 2004;
7.  Maryland regulations on the scope of LPN practice @
8.  http://www.dsd.state.md.us/comar/comarhtml/10/10.27.10.01.htm;
    http://www.dsd.state.md.us/comar/comarhtml/10/10.27.10.03.htm;
    http://www.dsd.state.md.us/comar/comarhtml/10/10.27.10.04.htm
9.  Psychological Autopsy for Thomas Gosier
10. Various school records, and letters to and from family members prior to arrest
11. Police Records of arrest
12. Medical Records, Peninsula Regional Emergency Record

## III.  Mr. Gosier's arrest and incarceration at Wicomico County Detention Center

Mr. Gosier was arrested on Aug 12, 2016, by the Salisbury Police Department.  He told the arresting officer about his suicidal ideation and he banged his head on the police car window (see Police Records).  Upon petition by the arresting officer, he was evaluated at Peninsula Regional Medical Center.  He was observed to be anxious and speaking rapidly, was noted to drink alcohol daily and use drugs, was diagnosed "Depression," but it was determined by Dr. Wild, the Emergency Room physician, that he was not imminently suicidal in light of odd behavior and

depression, and Gosier could be transported to jail.  However, the Emergency Room Record, noted under "Special" Discharge Instructions, the comment, "Please return to the emergency room immediately if your symptoms become worse or if you are unable to obtain follow-up with a primary care physician."   The police officer informed receiving officers at the jail about Mr. Gosier's statements about suicide and his odd behavior.  He was booked at the Wicomico County Detention Center on 8/12/2016 with mention of suicidal ideation on his Intake Observation Form. Mr. Gosier reported to C.O. Lyle at WCDC while being admitted that he was going to kill himself by shredding his mattress and strangling himself with the shreds, and that he had done the same thing previously in the Los Angeles County Jail.  He was initially placed on Suicide Watch by custody officers who felt he was at high risk of suicide.

## August 13

The 8/13/2016 clinical note by a medical clinician reports he is housed in suicide watch on the medical unit, per custody staff, and there needs to be follow-up by mental health staff.  The 8/13 Medical History and Physical Assessment by the medical physician, reflected in a note dated 8/15, all physical symptoms are noted negative.  There is no mention of substance abuse, nor of tattoos and needle marks on Mr. Gosier's arm -- the skin assessment is noted to be "normal." Another 8/13 clinical note by someone else documents his use of intravenous Heroin, ½ gram per day, and that he is currently in withdrawal.  There is an 8/13/2016 "Nursing Documentation Pathway, Withdrawal, Opiates," documenting the withdrawal protocol; and there is an 8/13/2016 entry on the "Problem List" indicating "Opiate Dependency," with no mention of depression or suicide risk.

On 8/13/2016 there is a "Correct Care Receiving Screening," documenting that there are no medications, notes Heroin use, no substance abuse treatment, objective: disheveled, tattoos, and needle marks."  The screening form includes a number of questions linked to suicide risk (officer notes risk of suicide, lack of family/friends, worried about problems, family history of suicide, has psychiatric history, suicide thoughts, has plan, previous suicide attempt, nothing to look forward to, signs of depression, anxious, ashamed, strange talk, under influence, incoherent, first arrest.) All of these suicide-linked questions on the screening form are noted "NO."  It is noted further that there is no history of psychiatric hospitalization, no psychiatric medications, and no mental health treatment.  The screener's objective observation is "… unremarkable except for slurred speech, or

could be appropriate (mark as ambiguous) -- noted on Suicide Watch per custody plus withdrawal protocol."   The screening form is signed by Michelle Gwaltney, licensed practical nurse.[2] According to another August 13 clinical note, he had verbally informed officers that he was suicidal, and he was moved, per officer orders, to Suicide Watch only after he was handcuffed to a bench and ripped a phone from the wall in an agitated state.  He was placed in four-point restraints on a gurney for 5 hours.  Then, while on suicide watch, he ripped a strip of material from his mattress and used it to attempt to hang himself.

## August 14

On 8/14/2016 there was another suicidal crisis.  He was already on suicide watch in the medical unit, but he told jail officers he was feeling suicidal.  He again tried to rip a strip of material from his mattress to affect a noose.  An 8/14/2016 Incident Report reflects that he had tied a strip torn from his mattress around his neck, officers intervened, he fought them, he had to be sprayed with pepper spray and taken to Suicide Watch in the medical unit, and he had to be restrained on a gurney.  He was agitated and officers used physical force and pepper spray to restrain him.  There is a note that on 8/14 he was pepper-sprayed because of being combative after a noose was removed from his neck.  He was restrained on a gurney for over 24 hours, from 8/14 at 11 AM until 8/15 at 2:08 PM, as noted in the clinical file.  The medical Nurse phoned Dr. Delmassey, the on-call psychiatrist, and he gave a phone order for a one-time emergency intramuscular injection: "8/14 Ativan 2 mg, Haldol 5 mg., Cogentin 1 mg. -- one time IM order, now."  The medications were given, and Mr. Gosier was reported to be calmer.  Dr. Delmassey did not come in to see him at the jail, and there is no real assessment, or treatment plan in that note on the chart.

## August 15

As of 8/15, there had not been an assessment by mental health staff, except a phone consultation with Dr. Dalmasy who prescribed intramuscular medications to calm Mr. Gosier while he was restrained on a gurney in the medical unit.  The first mental health assessment at the jail is by Jarvia Fishell on 8/15/2016.  She notes he had been in a foster home for 6 months at 16

---

[2] Ms. Gwaltney does not seem to have training nor a credential as a psychiatric nurse, on her "Student and Group Training Report" it is noted she completed training on "Suicide Prevention" **after Thomas Gosier's suicide**, on May 30, 2018 & August 15, 2017.

years; he denies abuse and mental health history; he has been in jail before; and his mother is in New York. Ms. Fishell diagnoses Heroin dependency & alcohol abuse, rule out Disruptive Mood Dysregulation. Treatment Plan is to remain on Suicide Watch.

### August 17

An 8/16/2016 "Psychiatric Prescriber's Assessment (If applicable)" reflects that he denies prior suicide attempts, he does have a history of being prescribed Risperdal (a newer generation anti-psychotic medication) and Klonopin (a minor tranquilizer), his father was Schizophrenic, he denies mania and self-injury (again, he had already tried to hang himself twice in the jail). Objective observations include agitation, leg rocking, rapid speech, depressed mood, poor insight (concrete), and "hyper" motor activity. The clinician writes: "Denied inpatient psych, or previous suicide attempts. Stated he 'acted out' R/T Opiate W/D when gesturing X2 with plastic string from mattress around neck." Diagnosis is Mood Disorder NOS (not otherwise specified), ADHD by history, and Opiate Dependency. "Will try Zoloft and Vistaril for depression and anxiety." The note includes "D/C (discontinue) Suicide Watch from 8/13, change to Welfare Watch, would likely benefit from OP (outpatient) Services RTC." RTC means return to this clinic, presumably signifying a return visit with the prescriber, but no date or length of time for a return visit is specified. The assessment is not signed, and at the top the "Name of Person Involved" is MCO Morris #334. This leads me to conclude that the psychiatrist, Dr. Delmassey, did not see Mr. Gosier.

On 8/17/2016 there is a disciplinary hearing on multiple charges stemming from the 8/13 and 8/14 suicide crises. Mr. Gosier is found guilty and sentenced to 40 days in solitary confinement. He is placed in segregation or lockdown (solitary confinement). A day later a "Pre-Segregation Health Evaluation" is filled out by Ms. Gwaltney (8/18/2016). For the question "Have you ever done anything, started to do anything, or prepared to do anything to end your life?," "NO" is ticked, despite of the fact he had already made two suicide attempts in the jail. Elsewhere the note reflects concern about his recent suicide attempts at the jail, with no comment about the contradiction with his responses to questions. The current mental status is noted as unremarkable, but the suicide attempts are noted and a mental health assessment is requested.

### August 18

An 8/18 "Suicide Watch Initial Assessment" by Ms. Fishell has questions about suicide, all ticked "NO" or left blank. The question "Have you ever done anything, started to do anything, or prepared to do anything to end your life?" is ticked "NO," in spite of the fact he was on Suicide Watch and had made two attempts to strangle himself in the jail and was known to have had at least one prior suicide attempt before entering WCDC. He had requested mental health contact a day earlier and was told he could not see mental health staff until the next day, and then he told custody staff he felt like hurting himself and they put him on Suicide Watch before Ms. Fishell came to see him the next day. Ms. Fishell discontinued Suicide Watch and placed him on Welfare Watch. On the same day, 8/18/2016, Ms. Fishell administered the Columbia-Suicide Severity Rating Scale. For question No. 6., "Have you ever done anything, started to do anything, or prepared to do anything to end your life?," NO is ticked. Mental status is noted to be unremarkable.

## <u>August 19</u>

While in segregation, on 8/19/2016 he complained to an officer he needed protection. Subsequently, on the same day he complained three times to a C.O., the first time he complained that he was experiencing chest pain, the second time he asked what would happen if he swallowed a razor, and the third time he told the C.O. he had swallowed a razor. She did not respond to any of these acts until later, when she requested a mental health consultation. Meanwhile he remained on "Welfare Watch," in segregation with checks by officers every 20 minutes. An 8/19 clinical Progress Note reflects that he told an officer he swallowed a razor, but he had no razor. It is reported he wanted to transfer to the psychiatric hospital because he was having trouble in lockdown. The note states: "Made statement to C.O. today that he swallowed a razor. Known not to have a razor. Patient states he is having trouble in lockdown and thought he wanted to be taken to hospital where he could get crazy or suicidal and get placed in psychiatric hospital." Anxiety was noted to be "Moderate," Mood "Frustrated". Regarding his anxiety about being in segregation, the mental health counselor recommended he focus on a short time period and not on the 40 days. He was to be seen again in "2 X Week" (I interpret this as two times per week, but he would not be seen again by mental health staff prior to his fatal suicide attempt on 8/21). This note was signed by Jarvia Fishell.

**August 21**

There is an Incident Report on 8/21/2016 about a Suicide Attempt ending with Mr. Gosier's death.  The location was B Block, F Pod, Segregation.  Officers found him hanging with a sheet tied to holes in the top bunk.  C.O. Bare had talked to him at 12:35, and Mr. Gosier told him he cannot do 40 days in segregation.  C.O. Hare reassured him.  While still in segregation and on Welfare Watch, on August 21, 2016, he told officer Bare he could not do the 40 days in lockdown. Ten minutes later he "papered" the window of his cell door (covered the small window in the solid door with toilet paper).   At 12:55 the control booth announced Mr. Gosier's cell window was papered over.  Officers went in and found him hanging.  There is a log for Welfare Watch, Special Confinement Record.  P. 33 of 69 and page after, irregular times, first page has checks 2 hours apart, second page has typed times, 20 minutes apart, and initials that may reflect that someone initialed the time slots all at once.  An Affidavit by C.O. Robert Lee O'Day reflects the C.O. did not know Mr. Gosier.  C.O. O'Day was on shift on Aug 21.  He was assigned to do Welfare Watch every 20 minutes (or another officer would do it).  He knew of Mr. Gosier's past behavior and statements related to suicide.  It was Sunday, he let Mr. Gosier out of his lockdown cell for an hour, he watched t.v. and had a health screening by R.N. Joyce Parsons.  C.O. O'Day checked Mr. Gosier's cell at 12:40, he spoke to him, and Mr. Gosier said he was OK.  Ten minutes after rounds, he was notified Mr. Gosier had papered the window in his cell door.  He tapped on Mr. Gosier's Cell #2, there was no response.  He moved on and performed security checks on the other cells and ordered a prisoner in recreation to return to his cell, then he had them open Mr. Gosier's door and found him hanging from a bedsheet.  R.N.s Latoya Jenkins and Joyce Parsons administered CPR. He had a pulse when he was transferred by paramedics in an ambulance to hospital where he was pronounced dead by strangulation and hypoxia.

## IV.  Opinions

**Summary of Opinions**

In forming my opinions, I have relied on my training in general psychiatry, social and community psychiatry and forensic psychiatry; my decades of experience as a clinician, educator, researcher and consultant in the areas of delivery of mental health services in prisons and jails, and on the effect on mental health of solitary confinement and other conditions of confinement.

1. Suicide is a major problem in jails and prisons

    a. There are standards regarding the prevention of suicide in jail and mental health interventions with the suicidal inmate. Adequate screening for suicide and other mental health problems within a short time of jail admission is required per all standards and per policies in effect at WCDC.

    b. The screening for suicide implemented in Mr. Gosier's case was entirely inadequate, and evidenced - based on contradicting facts already recorded in the inmate's file - that he had attempted suicide prior to his admission to WCDC and that he was lying to the screener. The licensed nurse practitioner's job description includes review of records and careful assessment of the patient's clinical situation and environment (see "Nursing Process"

    <http://www.dsd.state.md.us/comar/comarhtml/10/10.27.10.02.htm>.

    c. Mr. Gosier exhibited multiple serious risk factors for suicide, including history of depression (diagnosed by Dr. Wild at Peninsula Medical Emergency Room), past suicide attempts (even twice in the jail), drug addiction and withdrawal, etc. His lying to staff is itself a very serious risk factor for suicide.

    d. Suicide risk assessment in jail is the first step in a triage system. Mr. Gosier gave indications when screened -- including custody staff's concern about his suicide risk, a history of a prior attempt, and his lying to the screener -- that he presented a very serious acute risk of suicide, but this was not the conclusion of the screener, she failed to note the lying, and an opportunity was missed to alert custody and mental health staff to his very serious risk of suicide. Competent screening is not limited to ticking boxes on a form. The screener must consider all available information, including the inmate's mental status and information from custody officers and from the record. This was obviously not done when Mr. Gosier was screened. Also, it seems from review of documents that Ms. Gwaltney did not have adequate training regarding screening assessment for suicide risk.

e. Correct Care Solutions Policy #OPS-100_G-05, "Suicide Prevention Program --Wicomico MD" requires that a potentially suicidal inmate be evaluated by a QMHP promptly, and then be seen daily by mental health staff.  Neither of these requirements were satisfied, Mr. Gosier was seen for the first time by mental health staff on August 15, and was not seen daily after that.

f. Communication is one of the most important preventive measures regarding jail suicide.  The arresting officers did communicate to jail staff that Mr. Gosier was suicidal, but medical and mental health staff seem not to have taken into account custody staff's level of concern about Mr. Gosier's suicidality, and nobody seems to have checked his file for contradictions and additional facts relevant to his suicide risk.

g. Suicide Watch, Observation Cells and the therapeutic relationship.  Mr. Gosier was maintained on Suicide Watch per custody staff, but there seems to have been very little conversation with him about why he wanted to kill himself, and the record reflects no real attempt for mental health staff to form a therapeutic relationship with him.

h. Treatment plans with respect to Mr. Gosier are very deficient and do not provide for continuous monitoring regarding suicide and self-harm, for example there was no "staggered watch," as described in Correct Care Solutions Policy #OPS-100_G-05, following his being downgraded from full Suicide Watch.  Suicide Risk often lasts longer than a few days.  Mr. Gosier was released from Suicide Watch with no real treatment plan outlining incrementally reduced monitoring, not even the aforementioned "staggered watch."  Except for brief and infrequent conversations with mental health staff, there seems to have been very little effort to provide mental health treatment besides Suicide Watch and psychotropic medications.  There was no plan in place to monitor the psychotropic medications that were prescribed.  The psychiatrist never saw Mr. Gosier in person and the psychiatric nurse practitioner who prescribed Zoloft and Vistaril did not do any follow-up.

  i. Policies and practices at a detention facility which permit unqualified individuals to make mental health assessments -- including fitness for confinement, release from Suicide Watch and admission to solitary confinement -- increases the likelihood of inmate suicides.

2. Restraints

  a. There are three prerequisites for restraint such as shackling to a gurney for more that 24 hours: that it be rare, only applied after all less restrictive attempts to control behavior have been tried and failed, and it be applied for the shortest time possible. These three prerequisites are part of the controlling policy at WCDC, Correct Care Solutions Policy, OPS-100_1-01, "Restraint and Seclusion -- Wicomico."

  b. Mr. Gosier was restrained by shackling to a gurney twice, once for over 24 hours. This is an extreme measure in a jail. More important is that the very fact officers felt he needed that severe level of restraints is one more indication he was very disturbed and potentially very suicidal, and that he needed to be watched carefully until he could be transferred to a higher level of mental health treatment.

  c. Policies and practices at a detention facility which permit this type of restraint are grossly inhumane and can significantly contribute to the mental deterioration of an inmate and increase the likelihood of inmate suicides.

  d. Correct Care Solutions Policy, OPS-100_1-01, "Restraint and Seclusion -- Wicomico," not only requires the exhaustion of less restrictive measures and the utilization of restraints for the shortest time possible; the policy also requires a mental health assessment prior to the application of restraints (which did not occur in Mr. Gosier's case) and an in-person visit with the psychiatrist (which did not happen).

  e. Had WCDC/Conmed implemented and enforced policies that required 1) an adequate risk assessment/screening and 2) the development and implementation of an appropriate treatment plan for Mr. Gosier, both performed by qualified individuals, Mr. Gosier, more likely than not, would not have committed suicide while a pre-trial detainee at WCDC.

3.  Referral to higher level of mental health care

    a.  Mr. Gosier was much more disturbed and more suicidal than the mental health program at WCDC was set up to manage, and he should have been transferred on an urgent basis to a facility with a higher level of mental health care.

    b.  Policies and practices at a detention facility which fail to address the need to refer mental health crisis patients to a higher level of care, increase the likelihood of inmate suicides.

4.  Solitary Confinement

    a.  Instead of arranging for Mr. Gosier to undergo the level of mental health treatment his disorder and suicide risk required, he was punished and placed in solitary confinement. It is well known that solitary confinement is the site of at least 50% of all jail suicides, and there is a consensus in correctional mental health quarters that inmates at high risk of suicide should not be consigned to solitary confinement. To a reasonable degree of medical certainty, it is clear that consigning Mr. Gosier to solitary confinement immediately after he had made two suicide attempts in the jail was an important causative factor in his eventual suicide.

    b.  Policies and practices at a detention facility which permit placement of mentally ill inmates at heightened risk for suicide into segregation increase the likelihood of inmate suicides.

5.  Cries for Help

    a.  There were several times during his tenure at WCDC when Mr. Gosier made requests for help or bizarre or inappropriate statements that should have been treated as cries for help when uttered by an inmate at very high risk for suicide. For example, he told C.O. Bare just prior to killing himself that he did not think he could do 40 days in solitary. If C.O. Bare had interpreted Mr. Gosier's statement as a cry for help and placed him on Suicide Watch pending a mental health assessment, the suicide would likely not have occurred. But there is a much more obvious cry for help that did not elicit an adequate response by custody and mental health staff. On

August 19 Mr. Gosier told a C.O. that he was suffering from chest pain. Then he asked the same C.O. what would happen if he swallowed a razor. Then he told her he had swallowed the razor. She evidently decided he did not have a razor so there was no urgent crisis, and only later that day would she request a mental health consultation. The mental health staff member reassured him and scheduled him for follow-up appointments. But the three statements by Mr. Gosier were bizarre. They could only have been a cry for help -- that went unheeded. He had recently made two suicide attempts at the jail and was in solitary confinement. If the C.O. and mental health staff member had responded to his bizarre cry for help by putting him back on Suicide Watch and ordering more thorough mental health assessment, Mr. Gosier would most likely not have committed suicide on August 21.

6.  Role of the Psychiatrist

    a.  Mr. Gosier was not seen by a psychiatrist at WCDC, but he should have been examined by a psychiatrist on an emergency basis after making two suicide attempts in the jail, being restrained by shackling on a gurney, and being consigned to solitary confinement soon after his suicide attempts. A week went by between Mr. Gosier's second suicide attempt, involuntary injection with psychotropic medications per the psychiatrist's phone order, and restraint on a gurney; and his death by suicide on August 21, 2016. Had a psychiatrist seen him in-person and done a comprehensive mental health assessment, as required by all standards as well as the facility's policy on restraint, among other policies, Mr. Gosier would likely have been transferred to a facility with a higher level of mental health care and would not have committed suicide at WCDC.

    b.  Medications including Zoloft and Vistaril were prescribed on August 17 by a medical practitioner at the jail, still without an in-person evaluation by the psychiatrist. Zoloft is an antidepressant that takes up to two weeks to have an antidepressant effect, and meanwhile it often causes increased anxiety and agitation that can lead to suicide. The psychiatrist should have seen Mr. Gosier in-person in order to manage the suicidal crisis and monitor the

medications, and should have insisted that Mr. Gosier not be consigned to solitary confinement while still a high risk of suicide.

   c. Policies and practices at a detention facility which limit the availability for personal evaluation of mental health crisis inmates by a Psychiatrist, increase the likelihood of inmate suicides.

7. Inadequate Training in Suicide Prevention.

   a. Based on the many incorrect and dangerous acts and omissions by staff that I have pointed our throughout this report, I can only conclude that training for custody, health and mental health staff on suicide prevention has been grossly inadequate.

8. The Post-Mortem Review

   a. The post-mortem review is designed to lead to changes in policies and practices that will make suicide less a danger at the jail. The Psychological Autopsy for Mr. Gosier failed to mention that staff failed to respond appropriately to his very high risk of suicide, that he should not have been consigned to solitary confinement and that he should have been transferred to a facility with a higher level of mental health care.

**Commentary re Opinions:**

**<u>Suicide is a major problem in jails and prisons</u>**

Suicide is a very big problem in jails and prisons. The rate of suicide behind bars is much greater than in the general community, and the highest period of risk is the first few days following admission to the jail.[3] Consignment to solitary confinement is a major factor in the high suicide rate among jail inmates.[4] A considerable body of research reflects that of all successful suicides that occur in a correctional system, approximately fifty percent involve the three to eight percent

---

[3] Lindsay Hayes, "Suicide Prevention in Correctional Facilities: Reflections and Next Steps." *International Journal of Law and Psychiatry* 36 (2013) 188–94. <www.ncianet.org/suicide-prevention-in-correctional-facilities-reflections-and-next-steps/.>

[4] See Daniel P Mears & Jamie Watson, Towards a Fair and Balanced Assessment of Supermax Prisons, 23 JUST. Q. 232 (2006); see also Patterson, R.F. & Hughes, K. (2008). Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004, *Psychiatric Services,* 59(6), 676-682; Bruce Way et al., Factors Related to Suicide in New York State Prisons, 28 INT'L J.L. & PSYCHIATRY 207 (2005).

of inmates who are in some form of isolated confinement at any given time.[5]  The Correct Care Solutions Policy #OPS-100_E-09, "Segregated Inmates --Wicomico MD," states: "Experience has demonstrated that patients are at elevated risk for suicide when placed in isolated settings. Although not required by either NCCHC or ACA standards, it is a "best practice" to provide additional mental health screening during this high risk period, beyond that completed by health care staff when the patient entered segregation."

There are standards regarding the prevention of suicide in jail and mental health interventions with the suicidal inmate.  First and foremost is the standard of care in the community -- which is applicable in the jail setting.  In order to delineate the specifics of the standard of care in the community, there are two sets of relevant standards in this matter, the Maryland Commission on Correctional Standards: Standards, Compliance Criteria, and Compliance Explanations for Adult Detention Centers; and the National Commission on Correctional Health Care (NCCHC) Standards for Local Detention Facilities, especially Section J-B-05 "Suicide Prevention and Intervention," available at <https://www.ncchc.org/filebin/Resources/Standard_J-B-05.pdf>. Accreditation by the N.C.C.H.C. is elective, but their standards, according to which they audit, are the best delineation we have of the standard of care in the community.  The standards of the Maryland Commission are consistent with the N.C.C.H.C. standards, and the N.C.C.H.C. standards are applied to WCDC in the July 6, 2004 Settlement Agreement Between the U.S. Department of Justice and Wicomico County.  There are also guidelines produced by the American Psychiatric Association and other bodies.[6]

Screening for suicide and other mental health problems within a short time of jail admission is required per all standards, and by policies at WCDC (see Correct Care Solutions Policy #OPS-100_G-05, "Suicide Prevention Program --Wicomico MD"). In general, the screening instrument (questionnaire) utilized by WCDC is facially acceptable.  For example, there are several questions related to the issue of suicide.  This is appropriate.  If there is only one question -- for example, "are you feeling suicidal?" -- the arriving inmate is very likely to say no, no matter how seriously he or she had been thinking of self-harm.  By including several questions that get to the risk of

---

[5] Patterson & Hughes, supra note 3; Rusty Reeves & Anthony Tamburello, Single Cells, Segregated Housing, and Suicide in the New Jersey Department of Corrections, 42 AM. ACAD. PSYCHIATRY & L. 484-88 (2014).

[6] See *Psychiatric Services in Correctional Facilities*, American Psychiatric Association, 2016, Third Edition.

suicide in different ways, there is the opportunity for the inmate to settle down and start talking authentically to the screener and aver depressive and suicidal thoughts. The problem with the screening of Mr. Gosier on Aug 13 was not an inadequate screening instrument, it was that the training and practice of the screener, Ms. Gwaltney, was entirely inadequate. After doing an inadequate screening, she failed to put further measures in place to prevent suicide and treat Mr. Gosier. She failed to make use of information already available at the jail and failed even to utilize information she noted elsewhere on the screening form. The arresting officer had reported Mr. Gosier was acting bizarrely and talking about suicide, Dr. Wild had diagnosed depression, C.O. Lyle had documented Mr. Gosier's plan to commit suicide and his history of making an attempt in the Los Angeles County Jail, and officers at W.C.D.C. had been concerned enough to place him on Suicide Watch. The "Correct Care Receiving Screening" was filled out by licensed practical nurse Michele Gwaltney on 8/13/2016. The first of a series of questions on the screening form is "Arresting or transporting officer believes subject may be a suicide risk." Question #7 is "Expresses thoughts about killing himself." Question #9 is "Has previous suicide attempt." All three of these questions, and other similar ones, are inconsistently marked "No." But it was well known by staff at the jail by the time this screening occurred that Mr. Gosier had told the arresting officer he was suicidal, had told C.O. Lyle that he planned to kill himself and had made an attempt in the Los Angeles County Jail, and officers at the jail had already placed him on Suicide Watch. Correct Care Solutions Policy #OPS-100_G-05 on Suicide Prevention states: "When family, friends, outside professionals, other inmates, or correctional staff indicate that they are concerned that an inmate may engage in self-harm, these concerns are communicated to mental health staff and the inmate is evaluated without delay." Obviously, Mr. Gosier lied to the screener, but then the screener failed to note that his responses to screening questions directly contradicted what he had told the arresting officer and the officers who admitted him to the jail. In fact, Ms. Gwaltney noted he was on Suicide Watch and required a mental health intervention on the same form that she marked "NO" to all questions indicating suicide history and risk. And Ms. Gwatney failed to arrange mental health evaluation "without delay." No mental health staff would see Mr. Gosier until three days after he was admitted to the jail and had attempted suicide twice.

     An inmate lying is not an uncommon occurrence, but when it involves an inmate who is already believed to be dangerously suicidal, it is cause for great concern. When an individual is intent on committing suicide, he or she is quite likely to lie to a clinician asking whether he or she

is thinking of killing himself.  He does not want the clinician to find out he is suicidal and stop him.  The point here is that the licensed practical nurse doing the mental health screen had data available, in the record at the jail as well as in her own notation that he was on Suicide Watch, that proved he was lying.  (Mr. Gosier apparently lied to Ms. Gwaltney again, on August 18 when she filled out a "Pre-Segregation Health Evaluation." For the question "Have you ever done anything, started to do anything, or prepared to do anything to end your life?," she ticked "NO," again, in spite of the fact he had already made two suicide attempts in the jail.)

Lying is in itself an important risk factor for suicide.  It makes the screening entirely unreliable, but even more important, a prisoner who lies to staff is very difficult to monitor on Suicide Watch.  How is the mental health clinician to know whether and when the prisoner is no longer suicidal?  If he lied when screened, he could be lying when, after being placed on Suicide Watch, he is asked by staff if he continues to feel suicidal.  How can it be known whether he is safe for release from Suicide Watch?  And subsequently, how can any clinician who checks on him to see if he is suicidal -- for example in a pre-segregation mental health assessment -- know that he is being truthful when he says he has no plan to harm himself?  The answer is that the clinician cannot trust the responses to questions.  The only way to safely manage a potentially suicidal inmate who lies is for a highly trained mental health professional to spend time carefully talking to him, confronting him about his lies, and trying to get to the reasons for the despair that drives him to seek an end to his life.  This was obviously not done, the suicide screen is cursory and flagrantly inaccurate at best, and reflects very little in the way of meaningful conversation or clinical assessment of Mr. Gosier.

This poorly implemented suicide screening prevented staff from realizing how serious a risk of suicide Mr. Gosier presented, and prevented them from knowing that they could not trust his responses to questions to help them monitor his subsequent risk of suicide. This missed opportunity to discern his proclivity to lie to staff, and therefore the severity of his suicide crisis, contributed to the very wrong subsequent decision to abruptly release him entirely from suicide precautions and permit him to be consigned to solitary confinement.

Suicide risk is assessed on the basis of history and mental status examination, along with "risk factors."  An example of a risk factor is previous attempts at suicide.  Someone who has made prior suicide attempts is at much greater risk than the average person of committing suicide in jail.

Likewise, someone who is suffering from a serious mental illness is at heightened risk of suicide when incarcerated.  This is especially true if the mental illness involves depression, which Dr. Wild diagnosed at the Peninsula Hospital.  Depression too often leads to suicide, and thus, in considering the risks for suicide in an entering inmate, depression significantly increases the risk of suicide.  Someone who is in withdrawal from illicit drugs is at heightened risk because his behavior is unpredictable and besides, the fact that he is "high" or in withdrawal makes questionable his responses to staff's queries about his potential for suicide. Individuals who suffer from serious mental illness and individuals who are addicted to illicit substances or in withdrawal also share the characteristic that they are unpredictable -- they might sincerely tell a clinician they are absolutely not suicidal one minute, and then fall into deep despair and become suicidal the next.  Besides prior suicide attempts, the presence of mental illness and a history of substance abuse, suicide risk factors also include past trauma, feelings of hopelessness, impulsivity, a significant recent loss, the expectation of going to prison, physical illness and so forth.  As explained, above, lying is a very dangerous risk factor for suicide.  The purpose of screening for suicide risk is that inmates at high risk can be monitored closely to prevent their suicide.  The discovery that an inmate is lying to the person doing the suicide screen should lead to the implementation of intensive suicide precautions until a more thorough mental health assessment can get to the bottom of the lying and the risk of suicide.  Mr. Gosier was already on Suicide Watch because custody staff believed he was a high risk of suicide, but mental health staff would not even see him until two days after his screening (on 8/15 Ms. Fishell saw him), and then, from the record, it does not seem that anyone, including the psychiatrist, ever talked to him in depth about why he was lying and what was his true risk of suicide.

There are two especially important risk factors in Mr. Gosier's case: a history of past suicide attempts and a willingness to lie to clinicians.  It turns out that Mr. Gosier had made a suicide attempt in the Los Angeles Jail long before being admitted to WCDC, and he lied about that when screened at WCDC -- but he had told a custody officer about that.  These two risk factors alone made him a very high risk of suicide throughout his tenure in the WCDC (and he also presented other serious risk factors, including depression, drug withdrawal, previous psychiatric care and so forth).  Information about these two risk factors was readily available but missed or ignored by the individual doing his screening and by other clinical staff.  Had appropriately trained

staff at WCDC examined him adequately and realized what a high risk of suicide Mr. Gosier presented; they could have taken effective action to prevent his killing himself on 8/21/2016.

Suicide risk assessment in jail is only the first step in a triage system.  If an inmate answers in the affirmative to questions at screening aimed at uncovering suicide risk, or if he is detected lying to the screener, he must be placed in a housing situation where he can be continuously monitored and kept safe until a "higher level" mental health clinician can perform a more rigorous mental health assessment and create a treatment plan for preventing suicide.  According to the Maryland Commission on Correctional Standards, "Inmates suspected of having any of these problems (severely disturbed or mentally retarded inmates) should undergo a comprehensive mental health assessment and evaluation within a reasonable period of time by qualified mental health personnel (*i.e.,* psychologists, social workers, psychiatrists, etc.) to include: a review of the initial health screening data; the collection and review of additional information based on correctional staff observations; diagnostic interviews; compilation of a mental health history, etc." Mr. Gosier was already on Suicide Watch when a licensed practical nurse administered the screening instrument.  He exhibited a lot of very serious risk factors for suicide, but the triage system stalled at the level of a licensed practical nurse seeing him in an Observation cell in the jail.  His very high risk of suicide should have triggered an urgent face-to-face visit with a psychiatrist, a psychologist or a social worker, and a comprehensive mental health assessment should have been accomplished on an urgent basis.  This is what triage is all about.  It is fine for a medical staff member with no credentials in psychiatry to collect data for the screening instrument. But then, if there is anything inconsistent or alarming about the incoming inmate's responses to the questions on the form, the screener needs to refer to a more credentialed mental health professional, optimally a psychiatrist or clinical psychologist, who can assess the more complicated clinical picture and create a treatment plan.   But that never happened in the jail. Mental health staff did not see Mr. Gosier until several days after his admission to the jail, and by then he had already attempted suicide twice, had been restrained and been placed on Suicide Watch.  Had a mental health professional been called in to do a comprehensive examination earlier, and had that professional examined the lying and contradictory messages and the talk of prior suicide attempts, he or she could have realized the very high risk of suicide and devised a treatment plan to prevent Mr. Gosier's suicide.

Communication is one of the most important preventive measures regarding jail suicide; communication between arresting officer and jail personnel, between custody staff and health and mental health staff, and between staff and the inmate. Lindsay Hayes, the national authority on jail suicides, stresses the importance of communication in the prevention of jail suicide: "Communication among facility staff (correctional, medical, and mental health personnel). Effective management of suicidal inmates depends on communication between the facility's correctional personnel and other professional staff. Because inmates can become suicidal at any point during confinement, correctional staff must maintain awareness, share information, and make appropriate referrals to mental health and medical staff"[7]  A suicidal inmate will often tell one or another member of the jail staff about risk factors, about his plan to commit suicide or about other significant facts. That information has to be shared. In Mr. Gosier's case, he told C.O. Lyle about a previous suicide attempt in the Los Angeles County Jail and that he would utilize the same method for ending his life in the WCDC (which he eventually did). That information may not have been shared with mental health staff. Too often we find, after a jail suicide, that someone other than the mental health clinician had information the mental health clinician should have known about -- e.g. the officer who knew Mr. Gosier had a prior suicide attempt at the L.A. Jail. Again, after being consigned to solitary confinement around August 17, Mr. Gosier told C.O.s that he was suicidal being in solitary, and he was transferred back to Suicide Watch in the medical unit. But when Ms. Gwaltney filled out the "Pre-Segregation Health Evaluation" on August 18, she failed to note he had been having a hard time in solitary and had to be transferred back to Suicide Watch. The failure in staff communications played a significant role in Mr. Gosier's suicide. After all, if staff had fully realized how very suicidal Mr. Gosier was, and how hard a time he was having in solitary confinement, he could have been removed from solitary, provided more intensive mental health care, been transferred to a facility with a higher level of care, and his suicide could have been prevented.

Suicide Watch, Observation Cells and the therapeutic relationship. Suicide Observation Cells, in some places termed Safety Cells, are stripped down, very small rooms with little or no furniture except a mattress and gown made out of supposedly indestructible material (Mr. Gosier

---

[7] Lindsay Hayes, National Study of Jail Suicides: Twenty Years Later. U.S. Department of Justice, National Institute of Corrections, April, 2010.

would figure out a way to defeat this safety feature, he managed to tear off strips of material to use as a noose). There should be no protruding hooks or edges where a rope could be hung. There is a window through which the inmate can be observed and there is often a surveillance camera so that the observation can be constant. It is designed to be a safe place to confine someone who is imminently suicidal. But it is not a great place to keep someone for very long. It is like solitary confinement. The inmate in an Observation cell remains there just about 24 hours per day, is not permitted recreation and eats alone in his or her cell. At least once a day mental health staff come by and ask the inmate if he is still suicidal or is he ready to exit the Safety Cell. Since the cell is so cold and uninviting, there is nothing to do there, and staff do not really spend much time talking to him, he soon opts to be released and return to a regular jail setting -- even if he remains a very high risk of suicide.

Observation cells and Suicide Watch cannot be the entirety of a suicide prevention and crisis intervention program in jail. The Observation cell permits observation and monitoring for suicidal behavior. Adequate mental health treatment involves much more than that. Staff need to talk to the inmate in the Observation Cell, and to encourage him to talk about the despair that drives him to try and kill himself. In Mr. Gosier's case, they need to examine with him the reasons for his prior suicide attempts and his lying to staff doing the screening. Obviously, judging from the clinical chart and the fact that contradictory notations are not examined and there is very little in the way of psychiatric history or process, nobody really spent much time talking to Mr. Gosier during his tenure at WCDC. Too often, after a day or two, if the inmate no longer appears imminently suicidal, he is released from the Observation Cell. This does not mean he is no longer at high risk of suicide, it merely means staff believe there is no longer a need to keep him in an Observation Cell twenty-four hours per day. This is where a treatment plan is absolutely essential. Mr. Gosier was consigned to Suicide Watch and an Observation Cell in the Medical Unit twice, and each time he was soon released. But there are no adequate treatment plans in his chart, and on (or around) Aug 17, immediately after he was released from Suicide Watch, he was consigned to segregation or solitary confinement as punishment for his scuffling with officers and tearing out a telephone when he was first admitted to the jail. He was not out of danger of suicide -- far from it, as subsequent events would bear out -- when he was released from Observation, and as I will explain below, solitary confinement is actually the place where a majority of jail suicides occur.

Mr. Gosier remained a very high risk of suicide for the entirety of his incarceration at WCDC. Someone who makes two suicide attempts in the jail, has to be shackled to a gurney twice and once for more than 24 hours to prevent him from ending his life, and lies to clinicians so that they cannot accomplish an adequate risk assessment -- that individual remains a very high risk of suicide for a long time after being released from Suicide Watch. In fact, the Correct Care Solutions Polices & Procedures, OPS-100_G-05 Suicide Prevention Plan addresses that scenario directly. In Sections 3.7 and 3.8, the policy states: "Individuals are downgraded from constant watch to staggered watch before being taken off of suicide watch unless the rationale for bypassing staggered watch is documented by a QMHP (no such documentation appears in Mr. Gosier's chart).… Non-acutely suicidal inmates (individuals who express current suicidal ideation without a specific threat or plan, have a recent history of self-destructive behavior, or deny suicidal ideation but demonstrate other concerning behavior indicating the potential for self-injury) are placed on watch and monitored on a staggered schedule with no more than 15 minutes between checks." I believe, to a reasonable degree of medical certainty, that had Mr. Gosier been placed on staggered watch after it was decided he could be released from constant watch, and had mental health staff spent sufficient time talking to him to accurately assess his dangerousness, it would have become apparent that he remained dangerously suicidal and should be transferred to a higher level of mental health care. But no such process was activated, he was not only discharged from constant watch with no provision for staggered watch, he was almost immediately transferred to solitary confinement, the site within a jail of over half of completed suicides. Welfare Watch, as defined at WCDC, is no substitute for staggered watch and continued suicide monitoring.

Treatment Plan. There are acceptable formats for treatment plans. For example, there are "s-o-a-p notes." S is for subjective, what the patient tells the doctor. O is for objective, what the doctor observes, for example agitation or tearing. A is for assessment, how the patient is progressing, or what the doctor thinks is the patient's diagnosis. And P is for Plan. What form will the treatment take. A proper treatment plan in jail must include a housing recommendation -- does the inmate need to be in an Observation Cell, does his condition justify downgrading to "scattered watch," is solitary confinement safe for him? There is a very strong consensus in the field of correctional mental health that solitary confinement is not an appropriate consignment for someone who is dangerously suicidal or who suffers from serious mental illness. That consensus is reflected in Correct Care Solutions Policy #)PS-100_G-05 as well as in the subsequent Psychological

Autopsy for Mr. Gosier.  Other details are covered in a treatment plan, for example what kind of diet is appropriate or what activities.  And then there is monitoring -- if the inmate no longer requires the constant monitoring of Suicide Watch or staggered 15-minute-checks that were the transition plan out of Suicide Watch, what frequency and form of monitoring is appropriate?  Having a mental health staff member check in with the inmate each day is a possible plan -- and again, this plan is indicated in Correct Care Solutions policies on suicide prevention as well as on solitary confinement -- less strenuous monitoring than was in effect in Suicide Watch, but possibly enough monitoring that staff could feel confident that inmate was not going to harm himself.  In this regard, Welfare Watch at WCDC is not an adequate monitoring plan, since a solitary confinement cell contains the materials necessary to accomplish suicide and there is no ongoing clinical intervention to determine how suicidal Mr. Gosier might have been going forward.  The treatment plan needs to cover the future.  How long will the inmate need monitoring by a mental health professional each day?  There was no such treatment plan in Mr. Gosier's clinical file, and it was in his solitary confinement cell while on Welfare Watch that he succeeded in committing suicide on August 21.

Suicide Risk typically lasts much longer than a few days.  Typically, inmates are consigned to an Observation Cell and Suicide Watch and then, after a few days, returned to the part of the jail from which they came.  But that is very often a huge mistake.  A suicide crisis can have remarkable longevity.  Someone who becomes suicidal when he is admitted to jail, and makes two suicide attempts in the first few days at the jail and has to be restrained with shackling to a gurney twice, is not likely to get over his inclination to take his own life after a few days on Suicide Watch.  And in Mr. Gosier's case, we know he was not being truthful with staff about his continuing urge to take his own life.  One requirement for writing a treatment plan for him would be to outline stepwise diminution of monitoring contingent on his forthright sharing with mental health staff what he is feeling about harming himself.  For example, the plan could make his discharge from Suicide Watch contingent on his speaking openly about whatever ideas he is harboring about suicide.  Then, when he is discharged, he needs to be transferred to a setting where he will have continuing monitoring.  Lindsay Hayes recommends the following for this type of situation:

Two levels of observation are generally recommended for suicidal inmates:

Close observation is recommended for the inmate who is not actively suicidal but expresses suicidal ideation and/or has a recent history of self-harming behavior. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other behavior (through actions, current circumstances, or recent history) that could indicate the potential for self-injury, should be placed under close observation. Staff should observe such an inmate in a protrusion-free cell at staggered intervals not to exceed every 10 minutes (e.g., at 5 minutes, 10 minutes, 7 minutes).

Constant observation is recommended for the inmate who is actively suicidal (i.e., either threatening or engaging in suicidal behavior). Staff should observe such an inmate on a continuous, uninterrupted basis. Some jurisdictions also use an intermediate level of supervision, with observation at staggered intervals that do not exceed 5 minutes.

Given the fact that Mr. Gosier had prior suicide attempts, he lied to the screener, he required relatively long periods of restraint, he suffered from Depression, he was in drug withdrawal, and nobody at the jail really spent the time to take a complete history; Mr. Gosier needed ongoing close observation subsequent to his release from Suicide Watch.  He should not have been released from Suicide Watch with as little follow-up monitoring as he had, and certainly he should not have been consigned to solitary confinement, where it is well-known that approximately 50% of jail suicides occur.

## Restraints

More than 24 hours is a very long time to be shackled, prone, to a gurney in the medical area.  There are grave risks with this extreme kind of restraint.  Nurses did take vital signs while Mr. Gosier was shackled to the gurney, that is very important because inmates have been known to die of strangulation, regurgitation or suffocation while restrained on a gurney.  But still it was a very long time.  There is a consensus in the medical and mental health fields that in a correctional facility restraint should be limited to the rare instances where all less restrictive interventions have been tried and failed, and it should only be exercised for the shortest time possible.  Mr. Gosier was shackled to a gurney for over 24 hours between August 14 and August 15.  This violated all three parts of the general requirement about severe restraint: it should be a rare occurrence, should

only be applied when all less restrictive interventions have been tried and failed, and it should be instituted for the shortest time possible.  There had been no mental health contact for Mr. Gosier by the time he was shackled on the gurney, the fourth day of his stay at the jail.  So the "less restrictive alternative" of mental health staff meeting with Mr. Gosier and offering crisis intervention had not been tried and had not failed.  The time -- over 24 hours -- is a very long time for extreme restraint such as shackling to a gurney.  I recently reviewed "restraint chair" policies for all county jails in California.  The restraint chair is a slightly less dehumanizing and uncomfortable form of full-body restraint than shackling on a gurney, the individual is locked into a chair with wrists and ankles bound as well as a strap around the body.  In a significant number of the county policies I reviewed, a two-hour limit was applied to use of a restraint chair.  I offer that as contrast to the more than 24 hours Mr. Gosier had to endure in full-body shackles on a gurney.  It is my opinion that the more than 24 hours of shackling on a gurney constituted excessive force, it was not necessary and therefore it was excessive, and I will explain below why I say that.

But there are more important reasons why shackling Mr. Gosier to a gurney for more than a day was very damaging.  When severe restraint is utilized with a psychiatric patient or a jail inmate, there is a big risk that the therapeutic relationship will be jeopardized.  In other words, psychotherapy and other forms of mental health treatment depend heavily on the formation of a trusting therapeutic relationship between the clinician and the patient.  When we use involuntary restraint, especially something as severe as shackling to a gurney, the patient loses whatever trust he had that the clinician is a trustworthy ally in regaining his stability.  The risk of such use of restraint is that mental health treatment will not be possible after the inmate feels thus betrayed by mental health staff.  In fact, mental health staff did not really accomplish any kind of trusting therapeutic relationship with Mr. Gosier -- i.e. where he would be truthful -- and it is quite possible that the fact he had been subjected to an extreme kind of restraint was the cause of his distrust of staff.  In other words, the excessive restraint applied to Mr. Gosier actually increased the risk of his eventual suicide.

And there is an even larger danger in Mr. Gosier's case.  The fact that staff felt he needed to be restrained so severely was another indicator -- another risk factor for suicide -- that Mr. Gosier was very disturbed, and very suicidal.  It is very rare for jail staff to shackle an inmate on a gurney for more than 24 hours, they do so only when the inmate is extremely disturbed, or

extremely suicidal (as in Mr. Gosier's case).  The fact that custody staff felt so strongly about Mr. Gosier's dangerousness that they shackled him to the gurney should have alerted mental health staff to the severity of Mr. Gosier's mental disorder and risk of suicide.  That does not seem to have been part of the thinking of Ms. Gwaltney nor Ms. Fishell.  They did not make any effort to block the transfer of Mr. Gosier back to a solitary confinement cell after he required the 24+ hours of harsh restraint.  Had they realized that Mr. Gosier's severe restraint was one more very serious indicator of serious suicide risk, they could have instituted a treatment plan that would include housing arrangements to keep Mr. Gosier safe after being released from Suicide Watch.

## Higher level of care

The Maryland Commission on Correctional Standards (Standards Manual) is very clear about the requirement that a jail have available a facility with a more intensive level of mental health care than is available at the jail: "To the extent possible, severely disturbed and/or mentally retarded inmates should be referred for placement to appropriate non-correctional settings for care. Short of that possibility or while awaiting transfer to such facilities, these inmates are to be housed in specially designated areas of the institution with close and constant staff supervision."  All the standards for correctional mental health care that I am familiar with require that a correctional facility have an arrangement in place to transfer to another facility inmates who require more intensive mental health treatment than the correctional facility is capable of providing.

Suicide Watch involving Isolation in a cell, even with staff checking on the inmate's status *vis a vis* suicide risk, must be limited to a very short time.  If the inmate does not resolve the suicidal crisis and/or does not become psychiatrically stable in a relatively short time period (24 hours, 48 hours), the treatment staff must seriously consider admitting the acutely suicidal inmate or acutely decompensated inmate to an inpatient psychiatric ward, either at a psychiatric hospital in the community or at a unit within the correctional system that is credentialed as an inpatient psychiatric ward (clearly the WCDC does not contain an inpatient ward).  When an inmate is returned to Suicide Watch or Observation multiple times, that is an indication that he remains a high risk of suicide, and even if no single stint in Suicide Watch surpasses a few days, the fact that he needs to be returned to the Observation Cell repeatedly signals that his mental disorder and

suicide risk are too severe to be treated in the jail setting, and he must be transferred to a higher level of mental health care.

The standard of care in the community is very clear about this. The "crisis unit" or "hospital within a hospital" in the community is the model from which this standard of care is derived. Large psychiatric hospitals in the community typically have a crisis unit where individuals in acute suicidal crises or acute psychotic decompensation are admitted to receive time-limited, intensive urgent care. They are not yet admitted to the hospital ward, rather they are treated in the designated crisis unit. Clinical staff in the crisis unit utilize crisis or brief psychotherapy plus relevant psychotropic medications in an attempt to attain stability and end the suicidal crisis. If they are unsuccessful in doing so, for instance if the patient continues to aver or display suicidal or self-harming proclivities at the end of the 24-hour or 48-hour limit to the crisis intervention, the patient must then be admitted to the psychiatric ward in the hospital for ongoing treatment. If the clinical team in the crisis unit is successful in achieving remission and the patient is considered safe to go home, the patient can be discharged from the crisis unit to return home and come in later for a mental health clinic appointment. The controlling rule is that no patient can remain in the crisis intervention unit longer than the designated period because the fact that they have not stabilized with intensive treatment in that period indicates they require inpatient admission with ongoing suicide observation and psychiatric treatment.

Observation cells in jails and prisons, if properly run, are equivalent to the crisis unit at a hospital with a psychiatric ward. The inmate in a suicidal crisis, according to the standard of care in the community, must remain in the Observation cell only for a brief period (24 or 48 hours), as designated by policy, but no longer, and then, if the inmate has not returned to stability or remains a significant risk of suicide or self-harm, or if the inmate requires repeated stints in an Observation cell, he or she must be transferred to a higher level of mental health care, which might be a residential treatment center or inpatient unit within the correctional system or in the community. This is why there is the requirement that a jail or prison must have available an inpatient psychiatric unit for inmates who remain suicidal or decompensated longer than the day or the few days that they are permitted to remain in an Observation cell. The inmate's failure to recompensate or resolve the issues driving the suicide crisis means he or she is likely to be suffering from a more serious disorder and is likely to be at high risk of imminent self-harm, and therefore more intensive

mental health treatment is required that cannot be administered in the jail setting (unless there is an inpatient unit within the jail, and there is none at WCDC).

There are individuals who are too acutely psychotic, or too relentlessly suicidal, to be managed in a jail with limited mental health resources. There are urgent warning signs indicating that it is time to refer a jail inmate to a more intensive mental health treatment setting such as an inpatient ward. They include: Repeated suicide attempts in the jail; The need to admit the inmate more than once to Suicide Watch and an Observation Cell; The need to utilize severe restraints for long periods; The presence of very serious indicators of acute risk of suicide, for example multiple prior attempts, depression, drug withdrawal, lying to the staff person conducting a screening assessment, and so forth. Mr. Gosier was simply too disturbed, and too intent on killing himself, to be managed safely and effectively at the WCDC. There were insufficient mental health staff to do a timely assessment upon his admission and daily interventions from then on, the psychiatrist was unable to provide in-person assessment and intervention, he had to be placed on Suicide Watch more than once, and even while on Suicide Watch he made repeated attempts to kill himself, and he had to be restrained by shackling on a gurney for more than 24 hours. He needed to be transferred out of the jail to a facility where he could receive the more intensive mental health treatment that his condition required. Had he been transferred to a facility with a higher level of mental health treatment, he would almost certainly have been prevented from killing himself when he did.

## Solitary Confinement

There is a large literature reflecting that solitary confinement causes great human harm. It has been known for as long as solitary confinement has been practiced that human beings suffer a great deal of pain and mental deterioration when they are consigned to solitary confinement. It is predictable that prisoners' mental and physical state deteriorates in isolation. Human beings require at least some adequate or relatively normal social interactions and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality. In the absence of adequate social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts.[8] Disorganized

---

[8] Stuart Grassian. (1983). "Psychopathological Effects of Solitary Confinement." American Journal of Psychiatry 140(11):1450–54.

behaviors emerge.  Internal impulses linked with anger, fear and other strong emotions grow to overwhelming proportions, especially if there is any degree of mania.[9] Sensory deprivation is not total in solitary confinement units; there is the intermittent slamming of doors and there is yelling (one typically has to yell in order to be heard from within one's cell), but this kind of noise does not constitute meaningful human communication. Prisoners in this kind of segregation do what they can to cope. Many pace relentlessly or clean their cell repeatedly, as if the non-productive action will relieve the emotional tension. Those who can read books and write letters do so.  The tendency to suffer psychiatric breakdown and become suicidal is made even worse by sleep deprivation, which is a frequent occurrence among prisoners in isolated confinement.[10] Loss of sleep intensifies psychiatric symptoms by interfering with the normal diurnal rhythm (the steady alternation of day and night that provides human beings with orientation as to time), and the resulting sleep loss creates fatigue and magnifies cognitive problems, memory deficits, confusion, anxiety, and sluggishness. It is under these extreme conditions that psychiatric symptoms begin to emerge in previously healthy prisoners, and individuals suffering from mental illness experience an exacerbation of the mental illness or the suicidal crisis.[11],[12]

Again, it is well known that 50% of jail suicides take place in solitary confinement settings. Inmates in the midst of mental health deterioration or inmates at risk of suicide, should simply never be consigned to solitary confinement.  According to the N.C.C.H.C. standards on suicide prevention, "Unless constant supervision is maintained, a suicidal inmate is not isolated but is housed in the general population, mental health unit, or medical infirmary and located in close

---

[9] Peter Scharff Smith. (2006).  The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature.  *Crime and Justice* 34:441–528

[10] Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, CRIME & DELINQUENCY, 49(2), 124-156 (2003).

[11] Terry Kupers.  (1999).  Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It.  New York: Free Press.

[12] There have been a few outlier studies, utilizing very flawed research methodology, that have concluded solitary confinement does not cause harm (see MAUREEN L. O'KEEFE, KELLI J. KLEBE, ALYSHA STUCKER, KRISTIN STURM & WILLIAM LEGGETT, ONE YEAR LONGITUDINAL STUDY OF THE PSYCHOLOGICAL EFFECTS OF ADMINISTRATIVE SEGREGATION (2010).  The O'Keefe study as well as others designed to prove no harm from solitary confinement have been roundly debunked in the professional literature, see for example Stuart Grassian & Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement*, 13 CORRECTIONAL MENTAL HEALTH REP., May/June 2011; and Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 CRIME & JUST. 365 (2018).

proximity to staff. All cells or rooms housing suicidal inmates are as suicide-resistant as possible (e.g., without protrusions that would enable hanging)." Mr. Gosier was definitely a suicidal inmate, in spite of his having been recently released from Suicide Watch. His consignment to solitary confinement without adequate monitoring provided him the situation where he could take his own life, and he did precisely that on August 21, 2016. Had he not been consigned to solitary confinement and had he been thoroughly evaluated and ordered transferred to a facility with the higher level of mental health care his condition required, and had he been maintained in a safe housing situation with monitoring until he was transferred to the higher level of care, his suicide could have been prevented and his mental disorder could have been adequately treated. Training for custody, medical and mental health staff must contain rigorous discussion of the harm of solitary confinement and the requirement that no suicidal inmate should be consigned to solitary.

There was a gross failure in communication, screening, and training such that under the circumstances of this case Gosier's suicide was a near certainty. Based on the information available to correctional and healthcare staff, it is simply unacceptable and inexcusable to place an inmate at risk for suicide in solitary confinement with access to a bunk and sheets, two commonly utilized implements in jail suicides.

### Role of the Psychiatrist

It appears, from my review of records, that Mr. Gosier was never seen by a psychiatrist while he was incarcerated at the WCDC. Dr. Delmassy prescribed medications on the phone. The psychiatrist is the most highly trained member of the mental health team. In urgent situations, for example a serious suicide attempt, the use of extreme restraint such as shackling to a gurney, or repeated suicide attempts, the psychiatrist must personally examine the inmate/patient, decide on a treatment plan and write orders, for example orders for release from Suicide Watch or for transfer to a facility with a higher level of mental health care. If a psychiatrist had examined Mr. Gosier at WCDC, he or she would certainly have uncovered the lying during screening, the history of serious mental illness with the prescription of anti-psychotic medications, the prior suicide attempt at the Los Angeles County Jail, and so forth. The combination of risk factors in Mr. Gosier's case, his two suicide attempts at the jail, the need for prolonged severe restraint and his proclivity to lie to clinicians should have led the psychiatrist to disallow transfer to solitary confinement, to maintain suicide monitoring and to transfer Mr. Gosier to a facility where he could receive the

level of mental health care his condition required.  The fact that no psychiatrist saw Mr. Gosier at the WCDC played a part in his eventual suicide.  Instead of being seen by a psychiatrist, Mr. Gosier was seen by healthcare professionals who were not adequately trained or qualified to respond appropriately to his grave risk of suicide.  The psychiatric nurse practitioner who prescribed Zoloft and Vistaril on August 16 dismissed his two suicide attempts in the jail as "gesturing," with no documented evidence that he was not highly suicidal at the time and merely minimizing his risk while talking to her -- and she provided no follow-up to the one-time prescription of medications.

## **Inadequate Training**

Correct Care Solutions Policies & Procedures, OPS-100_G-05 Suicide Prevention Program contains Section 5.1 "Training."  In that section, it is specified that "All staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate increased risk for suicide and how to respond appropriate….  Initial and annual training are conducted, at a minimum…."  Training alerts staff to the following high-risk periods/individuals including: Upon admission,… Inmates with mental illness (including depression and bipolar disorder)…, Inmates who have a personal history and/or family history of suicide attempts, especially when these have occurred while incarcerated, Inmates newly admitted to segregation or in single-cell housing, intoxicated or detoxing from alcohol or other drugs…. In addition to initial and annual training, CCS mental health staff participate in additional training on suicide prevention more frequently. The Suicide Prevention Program includes: Staff perform focused screening at intake and ongoing monitoring…,  prompt evaluation of suicidal inmates by a Qualified Mental Health Professional, constant watch, downgrading to staggered watch before being taken off of suicide watch, non-acutely suicidal inmates (individuals without a specific plan… but demonstrate other concerning behavior indicating the potential for self-injury) are placed on staggered watch, and daily communication is essential between mental health staff, health staff and correctional staff regarding the status of any inmate who is on suicide watch.  In this report I identify multiple instances where these basic components of an adequate treatment plan were ignored or violated. The licensed practical nurse doing the screening did not take into consideration information that was readily available -- e.g. Mr. Gosier had made two suicide attempts already in the jail and had told an officer about a prior attempt at L. A. County Jail, and therefore he was lying when he told her he was not suicidal.  He also evidenced most of the risk factors listed in the Suicide Prevention

Policy.  The QMHP did not see him until three days after his admission to the jail and after he had made two suicide attempts and had to be restrained on a gurney twice, and then she did not perform daily follow-up assessments as spelled out in the suicide prevention .  The psychiatric nurse practitioner on August 16 did not question Mr. Gosier's false denial of a previous suicide attempt and termed his two attempts in the jail as "gesturing" in direct contravention of the training on non-acutely suicidal inmates who demonstrate other concerning behavior, and then she did not see him again and did not monitor his experience on the medications he was prescribed.  Custody, health and mental health staff all ignored or gave insufficient credence to Mr. Gosier's repeated pleas (cries for help) that he was not doing well in solitary confinement.  And the C.O. who discovered Mr. Gosier hanging from a noose had first knocked on his cell door and then, instead of entering immediately when there was no response, performed security checks on the other cells and ordered a prisoner in recreation to return to his cell before opening Mr. Gosier's cell door.  All of these inadequate measures and gaps in service reflect deficient training for all staff in suicide prevention.

## The Post-Mortem Review

The purpose of a post-mortem review from a medical perspective, is to uncover policies and practices that may have contributed to an unfortunate suicide in jail, and then to revise and correct those policies and practices to prevent future repetitions of inmates' demise by suicide. After outlining the events of Mr. Gosier's incarceration at WCDC, the Psychological Autopsy authored by Celeste Andrews, Health Services Administrator, and Jarvia Fishell, LCPC, recommends that all inmates being removed from Suicide Watch be seen by mental health the following day, the mental health team utilize more frequent collaboration and case review, inmates removed from Suicide Watch be housed with a cellmate if that is safe, practices regarding the treatment of ADHD be reviewed, and inmates in segregation be given the "Escape the Cage" program.  As I discuss in this report, there were substantial mistakes made during Mr. Gosier's tenure at WCDC, including but not limited to a badly bungled screening assessment for suicide, inattention to his obvious lying and other important risk factors for suicide, the use of excessive force, delays in or absence of adequate interventions by mental health staff, inadequate treatment plans, inattention to "cries for help," the absence of a visit with a psychiatrist, the consignment of a very suicidal inmate to solitary confinement, and the failure to even consider transferring Mr.

Gosier to a facility where he could receive the higher level of mental health treatment his condition required.  The Psychological Autopsy reflects some but not all of these areas of concern, and the recommendations are entirely inadequate.

Had WCDC/Conmed implemented and enforced policies that required 1) an adequate risk assessment/screening and an adequate mental health assessment, and 2) the development and implementation of an appropriate treatment plan for Mr. Gosier, both performed by qualified professionals, Mr. Gosier, more likely than not, would not have committed suicide while a pre-trial detainee at WCDC.

I hold the opinions expressed herein to a reasonable degree of medical probability based on my education, training, and experience.  The opinions expressed herein are based on what I have reviewed, and I reserve the right to supplement or amend these opinions based on additional information.

Respectfully submitted,

Terry A. Kupers, M.D., M.S.P.