**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DONNA LYNN MALONE**, *et al.*, | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | **Civil Case No. 19-2412-SAG** |
| | * | |
| **WICOMICO COUNTY, MARYLAND,** | | |
| *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Donna Lynn Malone, in her individual capacity and as personal representative of her son's estate, sued Defendants Wicomico County, Maryland ("Wicomico") and Conmed, LLC ("Wellpath") for claims arising out of the custodial suicide of Thomas Alan Gosier.[1]  Pending before this Court are Wellpath's Motion for Summary Judgment, ECF 74, and Wicomico's Motions for Summary Judgment and Judgment on the Pleadings.  ECF 77, 75.  The issues have been fully briefed, ECF 84, 89, 91, and no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021). For the reasons stated below, Wellpath's and Wicomico's Motions for Summary Judgment, ECF 74, 77, will be granted in part and denied in part.  Wicomico's Motion for Judgment on the Pleadings, ECF 75, will be denied as moot.

---

[1] The Complaint also names a use plaintiff, Mr. Gosier's father, Daniel Gosier.  For ease of reference, however, this Court will simply use "Plaintiff" to refer to Malone.

I.      **FACTUAL BACKGROUND**

The facts described herein are viewed in the light most favorable to the Plaintiff as the non-moving party.

This case centers on the tragic death of Plaintiff's son, Mr. Gosier.  The record reflects that from his first interaction with law enforcement, Mr. Gosier demonstrated serious mental health needs and an acute risk of self-directed violence.  Wellpath and Wicomico employees repeatedly observed—or were directly informed by Mr. Gosier—of his suicidal ideations.

On August 12, 2016, Mr. Gosier was arrested in Salisbury, Maryland, in connection with an alleged theft from a Giant grocery store of several bottles of Benzedrex nasal spray, which is commonly used to mimic the "high" achieved from abuse of amphetamines.  ECF 77-6 at 8 (Ex. 3, Wicomico Inmate Base File).  Upon arrest, Mr. Gossier became erratic and exhibited suicidal tendencies.  ECF 74-12 at 5 (Ex. J, Mr. Gosier Arrest Records, Aug. 12, 2016: "[w]hen Gosier was placed under arrest and placed into the vehicle, he became very agitated.  Gosier advised that he wanted to kill himself, and began hitting his head against the rear passenger window where he was located.").  Police officers transported Mr. Gosier directly to Peninsula Regional Medical Center for evaluation.  *Id.* at 12 ("Due to Gozier [*sic*] making comments about harming himself and being combative with officers, an emergency petition was completed prior to taking him to [the Wicomico County Detention Center ("WCDC")]".  Later the same day, Mr. Gosier was taken to WCDC and examined by Corrections Officer ("CO") Verdus Humphries in the presence of a Salisbury Police Officer.  ECF 77-6 at 11, 18 (Ex. 3, Inmate Base File).  The intake observation form at WCDC indicated that Mr. Gosier had inclinations toward self-harm, but that he denied feeling suicidal.  *Id.* at 18.

At approximately 4:00 AM on August 13, 2016, Mr. Gosier appeared before a Wicomico District Court Commissioner, who committed him to WCDC with bail set at $10,000.  *Id.* at 8.

Roughly an hour later, while Mr. Gosier was in the male holding tank ("MHT") of the central booking post ("CBP"), CO Shawn Lyle reported hearing an individual scream, "Yo, CO I feel suicidal!"  ECF 77-8 at 16 (Ex. 5, Aug. 13, 2016, Incident Report).  Upon investigation, Mr. Gosier told CO Lyle that he intended to kill himself by shredding a mattress in the MHT cell.  *Id.*  Mr. Gosier was subsequently removed from the MHT and handcuffed to a bench in the general area of the CBP.  *Id.*  While handcuffed to the bench, Mr. Gosier attempted to tear a nearby enrollment phone from its wall mount.  *Id.* at 2.  COs shackled Mr. Gosier in leg irons, escorted him to the medical section, and placed him on "suicide watch."  *Id.*

Pursuant to Wicomico policy, inmates on suicide watch undergo an initial medical assessment, and are relocated to designated "suicide cells" within the medical section of WCDC. ECF 77-4 at 2-3 (Ex. 1, George Kaloroumakis Aff., Oct. 25, 2019).  While on suicide watch, inmates are assessed three times daily by medical staff.  Suicide watch inmates are visually observed by COs at fifteen-minute intervals and are continuously monitored via a closed-circuit television camera mounted in each cell.  *Id.*; *see also* ECF 84-15 at 2 (Ex. 14, Wicomico Special Confinement Policy).

Approximately an hour after being placed on suicide watch, Mr. Gosier ripped a plastic covering off his "suicide mattress", approached his cell door, and told a CO that he was planning to wrap the material around his throat to choke himself.  ECF 77-8 at 2, 6, 14 (Ex. 5, Aug. 13, 2016, Incident Report).  In response, COs handcuffed Mr. Gosier and escorted him to the gurney room, where he was restrained on a gurney for several hours "pending mental health review."  *Id.* at 2.

At approximately 1:40 PM on August 13, licensed practical nurse ("LPN") Michele Gwaltney, a Wellpath employee, completed an initial intake assessment and receiving screening

3

for Mr. Gosier.  ECF 74-14 at 22 (Ex. L, Mr. Gosier's Medical Chart During Incarceration).

During the receiving screening, LPN Gwaltney noted no risk factors for suicide.  *Id.*  Despite being

informed by Mr. Gosier that he was on suicide watch because he "took bed sheet and ripped it into

strips and braided it to make a nuse [*sic*]", LPN Gwaltney recorded on the form that Mr. Gosier

had no previous suicide attempts.  ECF 74-14 at 57 (Ex. L, Mr. Gosier Medical Chart); *see also*

ECF 84-23 at 69:3-70:6 (Ex. 22, Michelle Gwaltney Dep., Oct. 16, 2020).  LPN Gwaltney did,

however, place an urgent referral to the mental health department.  ECF 74-14 at 57 (Ex. L, Mr.

Gosier Medical Chart).  Mr. Gosier remained on suicide watch throughout the evening of August

13.  ECF 84-14 at 2 (Ex. 13, Cell Transfer Log).

The following day, on Sunday, August 14, Mr. Gosier continued to demonstrate acute

inclinations toward self-directed violence.  At 9:30 AM, while in his suicide watch cell, Mr. Gosier

ripped the plastic lining from his suicide mattress and fashioned it into a noose, which he secured

to his cell toilet, tied around his neck, and began to tighten.  ECF 84-13 at 43:13-19 (Ex. 12, Otha

Byrd Dep., Feb. 26, 2021).  Upon witnessing Mr. Gosier's actions, Shift Supervisor Lieutenant

Byrd entered the cell and attempted to remove the plastic lining from Mr. Gosier's neck.  *Id.* at

44:2-20 ("I tried to get him to stop moving and then I was trying to also cut it [the plastic] at the

same time . . . I'm fighting with him so I'm pulling . . . My main concern was trying to get that

thing off his neck.").  Because Mr. Gosier continued to resist staff intervention, Lt. Byrd sprayed

him with Oleoresin Capsicum (a/k/a pepper spray).  ECF 74-14 at 9 (Ex. L, Mr. Gosier Medical

Chart); ECF 77-10 (Ex. 7, Incident Report, Aug. 14, 2016).  Testifying later as to the incident, Lt.

Byrd stated that he interpreted Mr. Gosier's actions as a genuine attempt to kill himself.  ECF 84-

13 at 44:21-45:2 (Ex. 12, Byrd Dep.).

4

After being removed from his cell, Mr. Gosier was strapped to a gurney using a "four points" restraint and administered 2 mg Atican, 5 mg Haldol, and 1mg Cogentin.[2]  ECF 74-14 at 16 (Ex. L, Mr. Gosier Medical Chart).  Mr. Gosier would remain strapped to a gurney for the next 24 hours.  *Id.* at 31-34.  During this time, Wellpath medical staff monitored Mr. Gosier and recorded their observations on "gurney log" assessments, which were completed at 30-minute intervals.  *Id.*  These logs reflect that at 6:30 PM, roughly eight hours into his restraint, Mr. Gosier was "awake, yelling for officers." *Id.* at 33.  At 12:00 AM on August 15, Mr. Gosier was reported as "agitated, awake, screaming for officers."  *Id.*  At 12:30 AM, the logs reflect that Mr. Gosier was "in process of being restrained after defecating on himself." *Id.*  The morning of August 15— while still restrained to the gurney—Mr. Gosier was assessed by Jarvia Fishell, a licensed clinical professional counselor ("LCPC") and Wellpath employee.  ECF 74-14 at 47-53 (Ex. L, Mr. Gosier Medical Chart).  LCPC Fishell conducted her examination, in part, to determine if Mr. Gosier could be released from four-points restraint.  ECF 84-8 at 105:19-106:3 (Ex. 7, Jarvia Fishell Dep., Feb. 1, 2021 stating that her evaluation was "primarily to assist in determining whether he was at a safe level to be taken off the gurney and then what the next step would be").  Mr. Gosier denied having thoughts of killing himself or wishing he were dead.  *Id.* at 103:18-21; ECF 74-14 at 47-53 (Ex. L, Mr. Gosier Medical Chart).  At 10:30 AM on August 15, a full 24-hours after being strapped to a gurney in a four points restraint, Mr. Gosier was released to suicide watch.  *Id.* at 31.  Wicomico does not dispute that it lacks a policy regarding the maximum permissible duration of a custody-ordered four-points restraint.  ECF 91 at 13 ("There is also no ambiguity as to the fact

---

[2] Wellpath's Chief Psychiatric Officer for Communications, Dr. Johannes Dalmasey, authorized the administration of drugs to Mr. Gosier.  ECF 74-L at 16.  Because the incident occurred on a Sunday, there were no mental health professionals on site.  Dr. Dalmasy approved Mr. Gosier's drug injections over the phone.  ECF 84-23 at 75:14-77:5 (Ex. 22, Michelle Gwaltney Dep., Oct. 16, 2020).

that there is no set period for how long an inmate can be restrained on the gurney, although, from the record, twenty-four (24) hours seems to be the accepted limit.").[3]

On August 16, Mr. Gosier met with Jill Burgholzer, a psychiatric-mental health nurse practitioner ("PMHNP") and Wellpath employee. *See* ECF 84-10 at 8:8-20 (Ex. 9, Jill Burgholzer Dep., Nov. 23, 2020). In that meeting, Mr. Gosier denied thoughts of self-harm. ECF 74-14 at 44-46 (Ex. L, Mr. Gosier Medical Chart). PMHNP Burgholzer prescribed Zoloft and Vistaril to address Mr. Gosier's depression and anxiety. *Id.* at 16. Following her evaluation, PMHNP Burgholzer authorized Mr. Gosier's discharge from suicide watch to "welfare watch." ECF 84-10 at 44:1-19 (Ex. 9, Burgholzer Dep.); *see also* 84-13 at 2 (Cell Transfer Log). Pursuant to Wicomico policy, welfare watch is appropriate for inmates posing a generalized safety concern, but not an imminent threat to themselves or others. ECF 77-4 at 5 (Ex. 1, Kaloroumakis Aff.). Inmates placed on welfare watch are required to remain on welfare watch for a minimum of forty-eight hours and are visually observed by Wicomico COs at fifteen or twenty-minute intervals.[4] *Id.*

At 8:30 AM on August 17, CO Charles Ennis presided over a disciplinary hearing against Mr. Gosier for several infractions, including destruction of Wicomico property during his prior

---

[3] There are Wellpath policies and procedures regarding clinically ordered restraint and seclusion at WCDC. *See* ECF 84-61 (Ex. 60, Restraint and Seclusion—Wicomico MD). Mr. Gosier's restraint on August 14 was custody-ordered. ECF 91 at 13.

[4] In his affidavit, Wicomico designee and former WCDC Director George Kalourmakis stated that inmates on welfare watch are observed at 20-minute intervals. ECF 77-4. In her briefing in opposition, Plaintiff states that welfare watch only requires observation at 30-minute intervals. ECF 84 at 29 (citing ECF 84-3 (Ex. 2, Wicomico Suicide Prevention Program)). The corresponding exhibit to which Plaintiff cited, however, ECF 84-3, does not provide for 30-minute observations. In fact, it states that "non-acutely suicidal inmates (individuals who express current suicidal ideation without a specific threat or plan, have a recent history of self-destructive behavior, or deny suicidal ideation but demonstrate other concerning behavior indicating the potential for self-injury) are placed on watch and monitored on a staggered schedule with no more than 15 minutes between checks." *Id.*

suicide attempts.   ECF 77-8 at 20-22 (Ex. 5, stating among other infractions that Mr. Gosier

"willfully destroy[ed] his institutional mattress.").   In his defense, Mr. Gosier contended that he

had no recollection of the events in question because he was high on drugs.   *Id.* at 20.   CO Ennis

imposed a punishment of 40-days in disciplinary segregation (a/k/a "lockdown").   *Id.* at 21.

Disciplinary segregation is a punitive sanction in which inmates are subjected to "23-hour

lockdown for a maximum of ninety (90) days for a single incident."   ECF 84-15 at 2 (Ex. 14,

Wicomico Special Confinement Policy).   Wicomico policy requires that all inmates housed in

disciplinary segregation are provided with, at minimum, a daily visit from health care personnel.

*Id.* at 3 ("Unless medical attention is needed more frequently, inmate housed in segregation units

will receive a daily visit from health care personnel").   Wicomico policy further provides that

inmates with mental health issues in disciplinary segregation are "personally interviewed by

mental health staff at minimum once per week."   *Id.*   The imposition of lockdown did not alter Mr.

Gosier's status on welfare watch, and he continued to receive check-ins from Wicomico COs at

20-minute intervals.   *See* ECF 84-8 at 126:11-127:19 (Ex. 7, Fishell Dep.); *see also* ECF 84-14.

At 1:40 PM on August 17, Mr. Gosier asked a CO to see a mental health professional.   ECF

77-8 at 45 (Ex. 5, Inmate Classification File).   After contacting the medical unit, the CO informed

Mr. Gosier that he could be seen by a mental health professional the following day.   *Id.*   In

response, Mr. Gosier stated "oh no, I feel like hurting myself."   *Id.*   The Wicomico CO reported

Mr. Gosier's statement, and Mr. Gosier was removed from disciplinary segregation and placed on

suicide watch.   *Id*.

On August 18, LPN Gwaltney completed a "pre-segregation health evaluation", for Mr.

Gosier, which stated that his recent placement on suicide watch was a health risk factor.   ECF 74-

14 at 27-28 (Ex. L, Mr. Gosier Medical Chart).   During an evaluation that same day by LCPC

Fishell, Mr. Gosier denied having suicidal intentions. *Id.* at 41-42 ("[Mr. Gosier] was placed on SW [suicide watch] due to stating that he felt like hurting himself after being informed that MH [mental health] could not see him until the next day . . . [d]enied having suicidal ideation and . . . [d]id not realize he would be put on suicide watch"). As a result of the examination, LCPC Fishell authorized Mr. Gosier's discharge from suicide watch and his placement in disciplinary segregation while still on welfare watch. *Id.* From August 18, until his death three days later, Mr. Gosier remained in disciplinary segregation. ECF 84-14 at 2 (Ex. 13, Cell Transfer Log).

On Friday, August 19, at 9:35 AM, Mr. Gosier informed a CO that he feared for his life. ECF 77-7 at 35 (Ex. 4, Inmate Classification File). At 12:20 PM, Mr. Gosier called for medical attention. *Id.* at 37 ("Can you call medical and tell them I'm having chest pains and that its an emergency?"). Five minutes after, Mr. Gosier claimed that he had swallowed a razor. *Id.* ("what would happen if I swallowed a razor? . . . I swallowed a razor, Miss."). Later that afternoon, LCPC Fishell examined Mr. Gosier. ECF 74-14 at 37 (Ex. L, Mr. Gosier Medical Chart). Despite being informed of the statements Mr. Gosier made just hours prior, LCPC Fishell maintained his status on welfare watch, and did not recommend his placement on suicide watch. *Id.*; *see also* ECF 84-8 at 126:11-127:19 (Ex. 7, Fishell Dep.).

On Saturday, August 20, LPN Gwaltney conducted medical checks in segregated housing, and observed Mr. Gosier in no acute distress. ECF 74-14 at 26 (Ex. L, Mr. Gosier Medical Chart).

On Sunday, August 21, at approximately 9:00 AM, Mr. Gosier left his cell to recreate, shower, and use the phone. At 12:38 PM, Wicomico COs Bare and O'Day performed a welfare check. During the check, Mr. Gosier told CO Bare that he "could not do 40 days lockdown." ECF 84-69 at 2 (Ex. 68, Robert O'Day Incident Report, Aug. 21, 2016). In response, CO Bare reportedly stated that "it will pass before he knew it and that . . . he should stay positive." *Id.* Mr.

Gosier nodded his head in response.  *Id.*  COs Bare and O'Day took no further action regarding Mr. Gosier's statement.  *Id.*  At approximately 12:45 PM, Mr. Gosier covered his cell window with toilet paper, a violation of Wicomico policy.  ECF 77-16 (Ex. 13, Video of B Block, F Pod, Aug. 21, 2019).  Sometime thereafter, the Wicomico CO monitoring a closed-circuit camera notified COs Bare and O'Day that Mr. Gosier had obscured his window.  ECF 84-69 at 2 (Ex. 68, O'Day Incident Report).  At 12:54 PM, COs Bare and O'Day knocked on Mr. Gosier's door.  ECF 77-26 at 25:13-22 (Ex. 23, Robert O'Day Dep., Apr. 15, 2021).  After receiving no response, COs Bare and O'Day secured an inmate who had been on recreation back into his cell.  ECF 84-68 70:7-15 (Ex. 67, James Bare IV Dep.).  COs Bare and O'Day then completed welfare checks on the remaining cells in the pod before returning to Mr. Gosier's cell to investigate his covered window.  *Id.*; *see also* ECF 77-16 (Ex. 13, Video, Aug. 21).

COs Bare and O'Day opened the door to Mr. Gosier's cell at 12:55 PM.  *Id.*  Upon entering, they found Mr. Gosier "hanging by a bed sheet tied around the top bunk through the holes in the top bunk.  [Mr. Gosier] was in a crouched position with his legs in front of him."  ECF 84-69 at 2 (Ex. 68, O'Day Incident Report).  CO O'Day held Mr. Gosier up to relieve pressure in his neck, while CO Bare cut him down.  *Id.*  The COs began CPR and called for medical assistance.  *Id.*

For the second time in 10 days, Mr. Gosier was transported to Peninsula Regional Medical Center, where he was pronounced dead at 5:14 PM on Monday, August 22.  ECF 74-14 at 1-2 (Ex. L, Mr. Gosier Medical Chart).  This lawsuit ensued, in which Plaintiff pursues claims against Wellpath and Wicomico, but not against any of the individual actors.

## II.   LEGAL STANDARDS

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Defendants, as the moving party, bear the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad,* 823 F. Supp. 2d 334, 348 (D. Md. 2011).  If Defendants establish that there is no evidence to support Plaintiff's case, the burden then shifts to Plaintiff to proffer specific facts to show a genuine issue exists for trial.  *Id.*  Plaintiff must provide enough admissible evidence to "carry the burden of proof at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for Plaintiff.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 252 (1986). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Casey*, 823 F. Supp. 2d at 349.  Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  Plaintiff "must produce competent evidence on each element of his or her claim." *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999).  If Plaintiff fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Casey*, 823 F. Supp. 2d at 348-349.  In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Rule 12 of the Federal Rules of Civil Procedure states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings is assessed under the same standard

as that of a motion to dismiss. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999); *see also Shooting Point v. Cumming*, 238 F. Supp. 2d 729, 735 (E.D. Va. 2002), aff'd, 368 F.3d 379 n.4 (4th Cir. 2004) ("the standard of review [between 12(b)(6) and 12(c)] is identical."). To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).

Wicomico filed both a Motion for Judgment on the Pleadings, ECF 74, and a Motion for Summary Judgment, ECF 77, which are currently pending. This Court has previously ruled on Wicomico's Motion to Dismiss for Failure to State a Claim, *see* ECF 22, 32-33, using identical standards as would be used to assess Wicomico's pending Motion for Judgment on the Pleadings. There is no need to duplicate this Court's earlier analysis, *see* ECF 32, particularly in light of the additional factual development upon which Wicomico's Motion for Summary Judgment relies.[5] Wicomico's Motion for Judgment on the Pleadings will be denied as moot.

---

[5] Wicomico "has argued persistently throughout this litigation [that] the absence of individual defendants in an action under 42 U.S.C. § 1983 arising from individual conduct requires the dismissal of Ms. Malone's municipal liability claim against the County." ECF 75-2 at 4. Indeed, this Court considered and rejected such arguments in its earlier memorandum opinion on Wicomico's motion to dismiss. *See* ECF 32 at 6-8. Wicomico has proffered no caselaw to support its contention that Wicomico is only subject to liability if a jury affixes liability against an individual County employee. *See id.* (distinguishing this case from *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), because the absence of any risk of inconsistent verdicts). This Court has consistently made clear that only an underlying constitutional violation—not a judgment against named individual defendants—is a predicate to Plaintiff's *Monell* and Article 24 claims.

III.    **ANALYSIS**

A.  *Monell* **Liability Under § 1983 (Counts I and II)**

*Monell* liability under § 1983 only attaches "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978); *see also Davison v. Randall*, 912 F.3d 666, 688–89 (4th Cir. 2019).  Accordingly, to defeat summary judgment on Counts I and II, Plaintiff must raise a genuine issue not only as to an underlying constitutional injury, discussed in Section III.B, *supra*, but also as to whether the injury derived from the execution of Defendants' policies or customs.

The Fourth Circuit has delineated four ways in which a municipal "policy or custom" may be shown:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).  Where a policy or custom is facially unconstitutional, "the causal connection between policy and violation is manifest and does not require independent proof."  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987).  Where a demonstrated policy or custom is not itself unconstitutional, a plaintiff must demonstrate three elements.  *Id.* at 1388.  First, the plaintiff must show that the underlying constitutional harm stems from the acts of a municipal employee taken in furtherance of the identified policy or custom.  *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694).  Second, the policy or custom must be fairly attributable to the municipality.  *Spell*, 824 F.2d at 1389; *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014).  Third, there must be an

affirmative causal link between the policy and custom and the underlying alleged injury. *Spell*, 824 F.2d at 1389. Put differently, the policy must be "the moving force of the [underlying] constitutional violation." *Monell*, 436 U.S. at 695; *see also Cain v. Rock*, 67 F. Supp. 2d 544, 550 (D. Md. 1999) ("this proof requires . . . that the policy made the specific violation almost inevitable, rather than merely likely to happen.").

Viewing the facts in the light most favorable to the Plaintiff, this Court finds that Plaintiff fails to raise a genuine dispute of material fact as to whether Mr. Gosier's alleged injury was caused by actions taken in furtherance of a Wicomico or Wellpath policy or custom. *Spell*, 824 F.2d at 1389. Accordingly, this Court will grant Wicomico's and Wellpath's motions for summary judgment on Counts I and II.

     **i.**    **Wicomico**

In Count I of her Complaint, Plaintiff claims in part that Mr. Gosier's alleged constitutional injury arose from the execution of Wicomico's special confinement policy, which does not prohibit the imposition of lockdown on inmates who were previously on suicide watch.[6] ECF 84 at 42

---

[6] This Court understands Plaintiff as attempting to affix *Monell* liability on the basis of an express Wicomico policy—its special confinement policy. To the extent that Plaintiff instead claims that Wicomico is liable for its *lack* of a policy prohibiting lockdown for mentally ill detainees, this Court ascertains no evidence suggesting that the lack of such a policy provision "manifest[s] deliberate indifference to the rights of citizens." *Lytle*, 326 F.3d at 471. Much to the contrary, the facts dispel any inference of Wicomico's deliberate indifference to WCDC inmates. For instance, although Wicomico has no policy barring segregation housing for inmates formerly on suicide watch, it does prohibit lockdown for inmates *currently* on suicide watch. ECF 77-29 at 1 (Ex. 26, Charles Ennis Aff., Nov. 26, 2019). Wicomico policy further stipulates that an inmate may be removed from suicide watch only by a qualified healthcare provider, ECF 84-3, and that medical staff must be consulted on an inmate's fitness for segregation housing. ECF 84-63 at 17:4-13, 18:8-19:1 (Ex. 62, George Kaloroumakis, Dep., Apr. 20, 2021). Plaintiff offers an expert report concluding that Mr. Gosier's placement in disciplinary segregation "was a gross failure in communication, screening and training," but no facts to suggest that Wicomico's policy omission regarding formerly suicidal inmates manifests deliberate indifference. ECF 84-2 at 29 (Ex. 1, Kupers Report).

("Wicomico's failure to provide any guidelines or restrictions on punishing mentally ill pretrial detainees made [Mr. Gosier's death] a near certainty."). Plaintiff offers no facts demonstrating a causal link between Wicomico's special confinement policy and Mr. Gosier's allegedly inadequate medical care. Plaintiff does not dispute that Wicomico's special confinement policy required inmates in disciplinary segregation to be seen at least weekly by mental health professionals. ECF 84-15 at 3 (Ex. 14, Wicomico Special Confinement). Nor does Plaintiff dispute that Wicomico's separate welfare watch policy required Mr. Gosier to be observed at 20-minute intervals. ECF 77-4 at 5 (Ex. 1, Kaloroumakis Aff.). Indeed, the uncontested facts demonstrate that Mr. Gosier received daily attention from medical staff and mental health personnel while on disciplinary lockdown. *See* ECF 77-7 at 45 (Ex. 4, Inmate Classification File describing transfer to suicide watch on August 17); ECF 74-14 at 27-28, 41-42 (Ex. L, Mr. Gosier Medical Chart) (treatment from LPN Gwaltney and LCPC Fishell on August 18); *id.* at 37 (evaluation by LCPC Fishell on August 19); *id.* at 26 (check-in by LPN Gwaltney on August 20). The record does not support an argument that Wicomico's special confinement policy had any deleterious effect on Mr. Gosier's subsequent medical care, much less that it was the "moving force" of an alleged deliberate indifference to his serious medical needs.[7] *See Monell*, 436 U.S. at 695.

Alternatively, Plaintiff suggests that Wicomico can be liable for its failure to enact or maintain a policy regarding the maximum duration a detainee can be restrained on a gurney by

---

[7] This Court does not understand Plaintiff to challenge the conditions of Mr. Gosier's confinement under Eighth Amendment grounds. Certainly, this Court acknowledges that in certain instances, prolonged conditions of solitary confinement can violate the Eighth Amendment. *Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019), as amended (May 6, 2019). The Fourth Circuit is among the courts that "have taken note of this extensive—and growing—body of literature." *Id.* at 357. Plaintiff, however, alleges that the Wicomico's lockdown caused constitutionally inadequate medical care, not that the confinement itself was unconstitutional. This Court further observes that Plaintiff's disciplinary lockdown lacked either the duration or the harshness that characterized the Eighth Amendment violations in *Porter*. *See* ECF 84-15; *see also* ECF 77-1 at 16 n. 2.

COs.[8]  ECF 84 at 37-28.  Not only does Plaintiff fail to adduce facts suggesting that the absence

of that policy manifests deliberate indifference,[9] but she has no evidence of an "affirmative causal

link" between Mr. Gosier's confinement to a gurney on August 14-15 and his suicide nearly a full

week later.[10]

Next, Plaintiff raises "failure-to-train" arguments against Wicomico.  To be sure, the

"design and implementation of training programs and the follow-up supervision of trainees, is

necessarily a matter of 'policy' within the meaning of *Monell*."  *Spell v. McDaniel*, 824 F.2d 1380,

1389 (4th Cir. 1987).  Section 1983 liability is accordingly appropriate if municipal officers "are

not adequately trained 'in relation to the tasks the particular officers must perform,' and this

deficiency is 'closely related to the ultimate injury.'"  *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir.

2003) (quoting *Canton v. Harris*, 489 U.S. 378, 390–91 (1989)).  A municipality's or entity's

failure to train its employees, however, is only an actionable policy or custom under § 1983 where

it evinces a "deliberate indifference to the rights of persons with whom" the entity interacts.

*Canton*, 489 U.S. at 389.  In this instance, Plaintiff's claims consist of misleading or

unsubstantiated assertions that decisions made by Wicomico employees are essentially self-

---

[8] Neither party disputes that Wellpath maintains policies for clinical restraints ordered by health
staff.  Such policies provide in part that restraints shall not exceed six (6) hours absent a renewed
therapeutic restraint order.  ECF 84-61 at 6.

[9] Plaintiff proffers an expert report stating that "[i]t is very rare for jail staff to shackle an inmate
on a gurney for more than 24 hours, they do so only when the inmate is extremely disturbed, or
extremely suicidal (as in Mr. Gosier's case)."  ECF 84-2 at 24-25 (Ex. 1, Kupers Report).  The
report does not suggest that the absence of a prohibition against custody-ordered gurney restraints
of this duration suggests Wicomico's deliberate indifference to the rights of its inmates.

[10] Plaintiff's expert report concludes that gurney restraints may increase the likelihood of inmate
suicides—an assertion that falls well below the standard of proving causation—particularly
given the time lapse between Mr. Gosier's release from the gurney and his eventual suicide.  *See*
*Monell*, 436 U.S. at 695 (the policy must be "the moving force of the [underlying] constitutional
violation.").

evident demonstrations of training failure. This argument must fail. Wicomico has proffered evidence demonstrating that all COs completed extensive training requirements, including modules focused on suicide risk prevention. ECF 84-63 at 20:7-13 (Ex. 62, Kaloroumakis Dep.). To contest such evidence, Plaintiff points to Lt. Byrd's training log—which reflected his training for two years of his total 13-year tenure—that contained no suicide prevention classes. ECF 84-64 (Ex. 63, Byrd Training). That log does not contravene Lt. Byrd's sworn and uncontroverted testimony about his multiple suicide prevention trainings, and his history as an instructor of required courses in the Maryland Police Training Commission. ECF 84-13 at 27: 2-28: 6 (Ex. 12, Byrd Dep.). Plaintiff further condemns CO Bare's and O'Day's lack of training, arguing that "[CO] Bare testified that he did not receive any training on the increased risk of suicide for detainees in segregation housing until after Mr. Gosier's death." ECF 84 at 45-46. Although strictly accurate, Plaintiff's carefully worded contention overlooks evidence that COs Bare and O'Day had received general suicide awareness training. ECF 84-68 at 24:15-25-12 (Bare Dep.) (testifying that he received at least one or two full days of training on suicide awareness in academy, and that suicide awareness is consistently emphasized on the job); *see also* ECF 84-70 at 11:18-19, 30:2-4 (O'Day Dep.) (asserting that he was aware, from his training, that inmates on segregation are at heightened suicide risk). Thus, Plaintiff has not established a genuine issue of material fact as to deficient training of Wicomico employees.

Plaintiff also appears to argue that Wicomico is liable under *Monell* for the alleged injuries that arose as a result of Wicomico employees' divergence from its policies. *See* ECF 84 at 45 (stating that CO O'Day's and Bare's completion of welfare checks before opening Mr. Gosier's cell door was "not a matter of procedure, but a choice of convenience"). Plaintiff's assertions to this effect undercut its *Monell* claim, which requires that the harm flow from the *implementation*

of a municipal policy or custom.  *See Monell*, 436 U.S. at 694 (liability is appropriate where "execution of a government's policy or custom . . . inflicts the injury").

Because Plaintiff fails to raise a genuine issue of material fact as to whether a Wellpath policy or custom caused Mr. Gosier's alleged constitutional injury, Wicomico is entitled to summary judgment as to Count I.

### ii.    Wellpath

Plaintiff also attacks Wellpath's policy of assigning "unqualified" LPNs to complete inmate intake and pre-segregation evaluation forms.  ECF 84 at 18–19.  Plaintiff alleges that this policy led to the inappropriate minimization of Mr. Gosier's medical needs.  *Id.* ("it was Wellpath custom/policy for LPNs to complete these comprehensive evaluations, leading to suicides and suicide attempts"); *see also id.* at 21 ("this policy made injuries like those suffered by Mr. Gosier 'a reasonable probability, rather than a mere possibility.'").  Plaintiff's conclusory argument is unsupported by facts sufficient to draw a causal link between Wellpath's alleged policy and Mr. Gosier's alleged harm.  The record demonstrates that LPN Gwaltney placed an urgent referral for a mental health professional, ensuring prompt medical attention.  ECF 74-14 at 57 (Ex. L, Mr. Gosier Medical Chart).  Similarly, despite attributing Mr. Gosier's injury to LPN Gwaltney's completion of a pre-segregation health form, LPN Gwaltney's uncontradicted testimony demonstrates that the completion of this form had no impact on the decision to transfer Mr. Gosier to segregation.  ECF 84-23 at 81:15-83:22 (Ex. 22, Gwaltney Dep.).

Plaintiff further argues, to no avail, that Wellpath is culpable under *Monell* for failure to train its employees.  Plaintiff asserts that several Wellpath employees, including Michelle Gwaltney, Jill Burgholzer, and Jarvia Fishell, received no suicide risk training for several years preceding Mr. Gosier's death.  ECF 84 at 22, 32.  Plaintiff's conclusions, however, are based on

incomplete portrayals of the facts in evidence.[11] Ultimately, Plaintiff adduced no evidence suggesting Wellpath's training policies reflect a "deliberate indifference to the rights of persons with whom" Wellpath employees came into contact. *Canton*, 489 U.S. at 389, 109 S.Ct. at 1205.

Like with Wicomico, Plaintiff enumerates myriad alleged instances in which Mr. Gosier was harmed by Wellpath employees' *departure* from its established policies. *See, e.g.*, ECF 84 at 25 (alleging that Wellpath's personnel's actions toward Mr. Gosier "contradict[ed] Wellpath written policy and CDC guidelines."); *id.* (stating that PMHNP Burgholzer's use of the term "suicide gesture" contradicts Wellpath written policy). However troubling Plaintiff's allegations may be, they undermine her assertions of *Monell* liability, which as noted above attaches only when the execution—not the contravention—of a policy or custom inflicts the injury in question. *Monell*, 436 U.S. at 694 ("it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

---

[11] For instance, Plaintiff asserts that "Gwaltney testified that, around 2014, all of Wellpath's training moved online. The transcript of these training modules produced by Wellpath reveals that . . . [o]nly two of these modules, on August 15, 2017 and May 30, 2018, long after Mr. Gosier's death, pertain to suicide risk assessment." ECF 84 at 21. But in her deposition, LPN Gwaltney stated that she did not recall when Wellpath began transitioning more to online trainings. ECF 84-23 at 27:13-28:2 (Ex. 22, Gwaltney Dep.). The records themselves indicate that online trainings became more frequent throughout the relevant period (reflecting that from 2014 until 2016, LPN Gwaltney completed a collective total of 17 online trainings; by contrast, in 2017 and 2018, LPN Gwaltney completed 15 and 22 online trainings, respectively). *See* ECF 84-41 (Ex. 40, Gwaltney training). And while LPN Gwaltney did not complete *online* suicide prevention courses until 2017, she testified that prior to 2017 "[w]e got yearly suicide training. So it would have been more than likely the paper stuff . . . Prior to online modules, there was paper training." ECF 84-23 at 47:22-48:16 (Ex. 22, Gwaltney Dep.). PMHNP Burgholzer's testimony similarly reflects a pattern of consistent suicide prevention training. *See* ECF 84-10 at 23:1 –28:1 (Ex. 9, Burgholzer Dep.). Finally, although LCPC Fishell testified that during her two-year tenure at Wellpath, she only received initial suicide prevention training and periodic online training, she described her initial suicide prevention training as "comprehensive" and further recalled that Wellpath provided opportunities to discuss treatment methods for inmates that presented suicide risk. *See* ECF 84-8 at 41:6-44:17 (Ex. 7, Fishell Dep.).

Because Plaintiff fails to raise a genuine issue of material fact as to whether a Wellpath policy or custom caused Mr. Gosier's alleged constitutional injury, Wellpath is entitled to summary judgment on Count II.

### B. Article 24 (Count III)

An alleged violation of Maryland's Declaration of Rights is construed as a state constitutional claim. *Okwa v. Harper*, 360 Md. 161, 757 A.2d 113, 139-40 (2000). "Claims under Article 24 of the Maryland Declaration of Rights are assessed under the same standard as a due process claim pursuant to 42 U.S.C. § 1983." *Burkley v. Correct Care Sols.*, 2020 U.S. Dist. WL 2198123, at *5 (D. Md. May 6, 2020) (citing *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 77 (2000) ("This Court has interpreted Article 24 of the Maryland Declaration of Rights and the Due Process clause of the Fourteenth Amendment of the United States Constitution to be *in pari materia*")). Plaintiff's underlying claim of deliberate indifference to a serious medical need will accordingly be analyzed under the same standard used for a § 1983 claim for an alleged Fourteenth Amendment violation for inadequate medical care.

Importantly, although Article 24 mirrors in large part the Fourteenth Amendment principles underlying § 1983 claims, "different rules apply with respect to the remedies available for those violations." *DiPino v. Davis*, 354 Md. 18, 50, 729 A.2d 354, 371 (1999). One major difference is that "local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment." *Id.* at 51-52. In contrast to the *Monell* claims analyzed in Counts I and II, which required a policy or custom, Plaintiff may prevail on her Article 24 claim simply by demonstrating that that the underlying constitutional violation—inadequate

medical care—was perpetrated by a Wicomico or Wellpath employee within the scope of their employment.

In the post-conviction context, the Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Claims of a Fourteenth Amendment violation for a pretrial detainee's inadequate medical care are analyzed under the same standards as the Eighth Amendment. *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992); *see also Williamson v. Stirling*, 912 F.3d 154, 177 (4th Cir. 2018) (Pretrial detainees "possess at least the same rights as convicted prisoners."). To establish a constitutional violation for inadequate medical care, a plaintiff must prove two components. *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017). First, that the plaintiff "had serious medical needs, which is an objective inquiry," and second, "that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."[12] *Heyer*, 849 F.3d at 209–10.; *see also Farmer*, 511 U.S. at 834. A "serious medical need" is "one that has been diagnosed by a physician . . . or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks omitted). The second prong, deliberate indifference, requires "proof of the official's 'actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction.'" *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (internal citations omitted)). Deliberate indifference requires "more than mere negligence, but less than

---

[12] Plaintiff urges in the alternative that if this Court does not find a genuine issue as to subjective deliberate indifference, then it should adopt a revised deliberate indifference standard in light of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). ECF 84 at 5-6. For purposes of this motion, this Court need not consider a revised standard, upon finding that Plaintiff's claims raise a genuine issue of material fact under the more exacting, two-pronged standard.

acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Heyer*, 849 F.3d at 202 (quoting *Scinto*, 841 F.3d at 225 ); *see also Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("the denial of attention must be both deliberate and without legitimate penological objective."); *see also Jackson v. Sampson*, 536 Fed. App'x 356, 357 (4th Cir. 2013) ("[n]egligence or medical malpractice will not establish a sufficiently culpable state of mind."). "Deliberate indifference is a very high standard . . . the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695–96.

Neither Wicomico nor Wellpath disputes that the first prong—Mr. Gosier's objectively serious medical needs—is met in this case. *See*, *e.g.*, ECF 91 at 11 ("WCDC has never disputed that Mr. Gosier presented with serious physical and mental health needs during his incarceration); ECF 74-1 (addressing only the subjective prong of the deliberate indifference test). Accordingly, as there is no factual dispute as to the objective, serious medical needs of Mr. Gosier, this Court will dedicate its analysis to the alleged subjective deliberate indifference exhibited by Wicomico and Wellpath personnel.

### iii.   Wicomico

Plaintiff argues that Wicomico's subjective deliberate indifference is shown by: (1) Lt. Byrd's placement of Mr. Gosier in a prolonged four-points gurney restraint; (2) CO Ennis's imposition of disciplinary segregation; and (3) COs Bare's and O'Day's failure to report Mr. Gosier's comments and to respond immediately to his obstructed cell window on August 21. Taking all facts in the light most favorable to the non-moving party, this Court concludes that there is a genuine dispute of material fact as to whether COs O'Day and Bare—during and within the

21

scope of their employment—acted with deliberate indifference to Mr. Gosier's serious medical needs. As such, this Court will deny Wicomico's Motion for Summary Judgment on Count III.

### 1. Lt. Byrd

On August 14, after witnessing what he interpreted as a genuine suicide attempt, Lt. Byrd and other Wicomico personnel placed Mr. Gosier in a four-points restraint gurney, where he would remain for 24 hours. ECF 74-14 at 31-34 (Ex. L, Mr. Gosier Medical Chart). Plaintiff provides no evidence, however, to suggest that Lt. Byrd possessed subjective knowledge of any risks associated with prolonged restraint. *See Scinto*, 841 F.3d at 226. To the contrary, the evidence regarding Lt. Byrd's intervention on August 14 evinces a genuine attempt to alleviate Mr. Gosier's ongoing medical crisis. Plaintiff offers no facts raising an inference that the gurney restraint lacked a legitimate penological objective. *See Grayson*, 195 F.3d at 695. The undisputed evidence demonstrates that at the time Lt. Byrd placed Mr. Gosier on the gurney, he posed an acute threat to himself and others. *See* ECF 74-14 at 8 (Ex. L, Mr. Gosier Medical Chart) ("[Mr. Gosier] began spitting/biting at officers, yelling, profusely sweating…"); *see also*, ECF 77-10 at 3 (Ex. 7, Aug. 14, 2019, Incident Report stating that "Inmate Gosier was very combative and resistant with staff . . . spitting, kicking, scratching, biting: it took about 20 min to secure him properly to gurney."). Moreover, Wicomico's uncontradicted evidence indicates that mental health professionals participated in Wicomico's decision to remove Mr. Gosier from the gurney. *See* ECF 84-13 at 47:16-48:5 (Ex. 12, Byrd Dep.). At bottom, Plaintiff argues that Wicomico employees committed grave errors in judgment on August 14. *See* ECF 84 at 37 ("Lt. Byrd was subjectively deliberately indifferent to Mr. Gosier's serious medical needs by placing him in restraints because of his suicidal behavior, and leaving him there for 24 hours."). These criticisms are justified by no facts, however, suggesting Lt. Byrd or other Wicomico personnel acted with subjective indifference to

22

Mr. Gosier's serious medical needs.[13]  Moreover, as noted above, even if the duration of gurney restraint had amounted to a constitutional violation, no causal connection has been drawn between the use of the gurney and Mr. Gosier's eventual suicide.

### 2.  CO Ennis

Plaintiff's contentions against CO Ennis also fail for lack of evidence that Ennis possessed "actual subjective knowledge" of Mr. Gosier's medical condition when sentencing him to 40-days in lockdown.  *Scinto*, 841 F.3d at 226.  Plaintiff notes that CO Ennis knew, as a general principle, of the deleterious effects of segregation housing on inmates with suicidal tendencies.  ECF 84-66 at 23:21-24:1 (Ex. 65, Charles Ennis Dep., Feb. 17, 2021) ("if they showed suicidal symptoms, they could be—still be—that'd make them more suicidal.").  Plaintiff identifies no facts, however, to suggest that CO Officer Ennis understood or had access to Mr. Gosier's medical history.  To the contrary, Wicomico offers evidence, which is undisputed by Plaintiff, that CO Ennis had no knowledge of Mr. Gosier's medical conditions.  *Id.* at 18:2-12 (stating that he has no recollection of Mr. Gosier but that, "No, normally I wouldn't have known if he had any kind of mental disorder").  Consequently, he could not have been deliberately indifferent to a medical condition of which he was unaware.

---

[13] Plaintiff's reference to *Thompson v. Barker*, No. 2:18-CV-01318, 2020 WL 249446, at *8 (S.D.W. Va. Jan. 15, 2020) is of no avail.  In that case, a federal district court found that a genuine issue of material fact existed as to whether defendants were subjectively indifferent to an inmate's serious medical needs when they authorized his restraint to a gurney for 16 hours.  A third-party mental health provider had authorized four-point restraints for an additional eight consecutive hours after an initial eight-hour restraint, despite the fact that the inmate had not been examined by a physician.  *Id.* at 1.  The conditions of confinement in *Thompson* are readily factually distinguishable from those here.  In *Thompson*, the prison officials made no attempt to clean the plaintiff after he urinated himself on the metal bed to which he was shackled.  *Id.*  Here, Mr. Gosier was monitored every thirty minutes, permitted to walk and stretch at determined intervals, provided with food and water, and permitted to get up to use the restroom.  ECF 84-23 at 80:4-9 (Ex. 22, Gwaltney Dep.).

### 3.   COs Bare and O'Day

Plaintiff argues that COs Bare's and O'Day's conduct on August 21 raises a genuine dispute as to their subjective indifference to his serious medical needs.  This Court agrees.

On August 21, 2016, while COs Bare and O'Day were visually observing inmates in the B Block, F Pod, Mr. Gosier "expressed his inability to cope with forty days in segregation housing". ECF 84 at 43.  *See* ECF 84-71 at 2 (Ex. 70, Mr. Gosier stated that "he could not do 40 days lockdown").  Wicomico does not dispute that COs Bare and O'Day took no action in response to Mr. Gosier's statement.  COs Bare and O'Day were both aware that Mr. Gosier was on welfare watch and had therefore been adjudged by a medical professional to be a safety concern in need of enhanced observation.  ECF 77-26 at 11:4-12 (Ex. 23, O'Day Dep.).  Even more troublingly, both COs O'Day and CO Bare had actual knowledge that Mr. Gosier had been adjudged suicidal or had made suicide attempts during his short tenure at WCDC.  *Id.* at 11:4-12 (O'Day stating that he was aware Mr. Gosier came off suicide watch); ECF 84-68 at 60:1-15 (Ex. 67, James Bare IV, Dep.) (stating he was aware Mr. Gosier had previously attempted suicide within WCDC).  Despite this knowledge, COs Bare and O'Day did not report Mr. Gosier's statement.  COs Bare and O'Day's collective decision to disregard Mr. Gosier's words is compounded by their understanding that that they should contact a shift supervisor if an inmate or detainee expressed suicidal thoughts.  ECF 84-68 at 31:2-15 (Bare Dep.).  Given the COs' actual awareness of Mr. Gosier's serious medical condition, a reasonable juror could conclude that they possessed a subjective awareness of the excessive risk posed by their inaction.  *See Scinto*, 741 F.3d 219.  A reasonable juror could further conclude that the failure to report Mr. Gosier's statements to a shift supervisor—who would then contact medical—resulted in a denial of medical intervention that could have saved Mr. Gosier's life.

A reasonable juror could similarly determine that COs Bare and O'Day acted with deliberate indifference in waiting to open Mr. Gosier's cell door until after they had completed checks of the remaining cells.  At this juncture, COs Bare and O'Day had actual knowledge that Mr. Gosier had intentionally blocked any visibility into his cell just mere minutes after expressing hopelessness, and mere days after last attempting suicide.  Despite this troubling confluence of events, COs Bare and O'Day—after securing all inmates in their cells, as is required by Wicomico protocol—completed welfare checks on the remaining cells in the pod before turning their attention to Mr. Gosier.  ECF 84-68 at 70:8-15 (Bare Dep.).  Wicomico does not contend that there was a legitimate penological objective to complete regularly scheduled checks before attending to Mr. Gosier.  In light of Mr. Gosier's serious medical condition, his expressions of anguish, and his efforts to conceal his conduct, a reasonable juror could conclude that CO Bare's and O'Day's denial of attention to Mr. Gosier was deliberately indifferent to a serious medical need of which they were aware.[14]

This Court does not overlook Wicomico's evidence in support of the argument that COs Bare and O'Day were not deliberately indifferent.  This includes CO Bare's testimony that statements such as Mr. Gosier's were not unusual in the context of disciplinary segregation.  ECF 84-68 at 64:6-22 (Bare Dep.) ("[It] is a common statement with some inmates. Because I've had inmates that got into multiple fights, and they were sentenced 50 or even 60 days lockdown, and they say—they're not sure if they can do it.  And I do my best to give them just some positive encourage—words of encouragement—and to help them, you know, just take their mind off of it.").  Moreover, CO O'Day testified that the obstruction of a cell window was often a mundane

---

[14] Ultimately, Plaintiff will need to prove a causal connection between COs Bare's and O'Day's allegedly culpable conduct, and Mr. Gosier's injury.  In other words, she will have to persuade the jury that Mr. Gosier's death could have been averted by a more timely intervention.

occurrence.  77-26 at 31:7-12 (Ex. 23, O'Day Dep.) ("The majority of times when people have their window covered . . . it just means they want privacy to go to the bathroom.").  Finally, as Wicomico notes, COs Bare and O'Day—upon opening Mr. Gosier's door—acted promptly in their attempts to render emergency assistance, certainly indicating no affirmative intent to see him harmed.  *See* ECF 84-69 at 2 (Ex. 68, O'Day Incident Report).  This Court expresses no opinion as to whether Plaintiff will ultimately prevail in establishing liability on the basis of CO O'Day's and Bare's alleged deliberate indifference.  But at this juncture in the litigation, a genuine dispute exists.

Wicomico's Motion for Summary Judgment on Count III is therefore denied.

### iv.    Wellpath

With regards to Wellpath, Plaintiff alleges that deliberate indifference is demonstrated by (1) LPN Gwaltney's completion of inmate intake and pre-segregation evaluation forms; (2) PMHNP Burgholzer's discharge of Mr. Gosier from suicide watch on August 16; and (3) LCPC Fishell's failure to place Mr. Gosier on suicide watch on August 19.  This Court finds that there is a genuine dispute as to material fact as to whether LCPC Fishell acted with deliberate indifference to Mr. Gosier's serious medical needs.  This Court will accordingly deny Wellpath's Motion for Summary Judgment on Count III.

### 1.   LPN Gwaltney

Plaintiff first argues that LPN Gwaltney's subjective deliberate indifference is demonstrated by her allegedly inaccurate responses on an inmate intake form and pre-segregation evaluation form.  ECF 84 at 14-17.  These claims fall far short of satisfying the subjective component of the deliberate indifference standard.  First, it is not clear that LPN Gwaltney's completion of the requisite forms was meaningfully incorrect.  On the initial intake form, LPN

Gwaltney placed an urgent referral for a mental health professional.  ECF 74-14 at 57 (Ex. L, Mr. Gosier Medical Chart).  Likewise, on the pre-segregation evaluation, LPN Gwaltney accurately noted Mr. Gosier's prior suicide attempts and classified him as an inmate with special needs.  ECF 74-14 at 57 (Ex. L, Mr. Gosier Medical Chart).  Plaintiff raises several criticisms regarding various answers and responses that LPN Gwaltney recorded on these forms.  *See* ECF 84 at 15-16.  As well taken as these criticisms may be, they are at the very most, the kind of garden variety "negligence or medical malpractice [which] will not establish a sufficiently culpable state of mind."  *Jackson*, 536 Fed. App'x at 357.  Even had Plaintiff demonstrated a culpable subjective mindset, her claim against LPN Gwaltney would still lack any causal connection to the alleged constitutional harm.  See ECF 74-14 at 57 (Ex. L, Mr. Gosier Medical Chart) (Gwaltney's intake form resulting in attention from a mental health specialist); ECF 84-23 at 81:15-83:22 (Ex. 22, Gwaltney Dep.) (testifying that the pre-segregation evaluation as not used to determine placement in disciplinary segregation).  In short, Plaintiff's claims against LPN Gwaltney cannot meet the "very high standard" of deliberate indifference.  *Grayson*, 195 F.3d at 695–96.

## 2.  LCPC Fishell

Plaintiff further contends that there is a genuine dispute of material fact as to whether LCPC Fishell's decision to retain Mr. Gosier's status on welfare watch on August 19 constituted deliberate indifference.  This Court agrees.

On August 19, LCPC Fishell knew that on several occasions in the preceding days, Mr. Gosier had threatened or attempted suicide using Wicomico mattresses or bedding.  Specifically, LCPC Fishell had knowledge that: Mr. Gosier was placed on suicide watch on August 13 after threatening to shred his mattress, ECF 74-14 at 22; Mr. Gosier attempted suicide on August 14 by fashioning his suicide mattress into a noose, *Id.* at 9; Mr. Gosier expressed suicidal ideations on

August 17, ECF 77-8 at 45; and that on August 19, the day of her evaluation, Mr. Gosier reported fearing for his life and claimed to have swallowed a razor.  ECF 77-7 at 35-37.  Finally, LCPC Fishell was aware that on Friday, August 19, Mr. Gosier would be left without access to a mental health professional until the following Monday.  ECF 84-8 at 126:4-13 (Ex. 7, Fishell Dep.).  Even so, LCPC Fishell decided to allow Mr. Gosier to remain throughout the weekend in disciplinary segregation on only welfare watch, with unfettered access to standard bedding and a top bunk.[15]

In light of these facts, there is a genuine dispute as to whether LCPC Fishell acted with subjective knowledge of Mr. Gosier's serious medical condition and the excessive risk posed by her failure to place him on suicide watch.  *Scinto*, 841 F.3d at 226.  This Court is not insensitive to the difficult choices faced by mental health professionals in prisons and detention centers.  A jury may ultimately conclude that LCPC Fishell's decisions were a matter of considered professional judgment, however flawed they may appear in hindsight.  *See, e.g.*, ECF 84-8 at 126:11-127:19 (Ex. 7, Fishell Dep., stating "[T]he stress that people experience on segregation is less than what they experience on suicide watch . . . and so knowing that the correctional staff had an increased watch and that medical would also be available  . . . that's when I decided to leave him in segregation.").  At this stage in the proceedings, however, this Court finds that Plaintiff has provided enough admissible evidence as to each essential element of her Article 24 deliberate indifference claim against Wellpath.

---

[15] When asked, LCPC Fishell conceded that she could have ordered Mr. Gosier to be placed on suicide watch throughout the weekend.  She further admitted that she could have requested modifications to Mr. Gosier's cell, such that it would be more suicide resistant.  *Id.* at 72:5-74:8 (Ex. 7, Fishell Dep.).

### 3.  PMHNP Burgholzer

Plaintiff asserts that PMHNP Burgholzer acted with deliberate indifference by concluding that Mr. Gosier was not suicidal on August 16, and by merely treating him with ZOLOFT.  ECF 84 at 25 ("When . . . Burgholzer determined that Mr. Gosier was not suicidal . . . Mr. Gosier was being transferred to segregation housing, thereby increasing his suicide risk . . . Yet the medication prescribed by Burgholzer was the only component of any treatment plan for Mr. Gosier, and Burgholzer acknowledged that it would take 'a while' for the ZOLOFT to have any impact on Mr. Gosier's depression.").

Plaintiff's argument fails on several counts.  First, Plaintiff's assertions, on their face, amount to criticisms of PMHNP Burgholzer's choice of treatment, not assertions of deliberate indifference.  It is well established that issues of alleged negligence or misjudgment are well below the threshold of deliberate indifference.  *See Jackson*, 536 Fed. App'x 356, 357 (4th Cir. 2013). The insufficiency of Plaintiff's claims against PMHNP Burgholzer are illuminated by their contrast with the facts regarding LCPC Fishell.  Although Mr. Gosier had made several suicidal attempts or statements by August 16, the prior day (since his release from four-points restraint) had passed without incident.  Mr. Gosier denied having suicidal ideations during the examination, and PMHNP Burgholzer was aware that mental health professionals would examine Mr. Gosier on site in subsequent days.  ECF 74-14 at 7, 44-46 (Ex. L, Mr. Gosier Medical Chart).  In contrast, at the time of Fishell's examination on August 19, Mr. Gosier had made suicidal or self injurious statements on each of the three preceding days, Mr. Gosier had expressed anxiety about lockdown directly to Fishell, and mental health services would shortly become unavailable.  Simply put, PMHNP Burgholzer's conduct also does not satisfy the "very high standard" of deliberate indifference.  *Grayson*, 195 F.3d at 695–96.

29

Plaintiff's assertions against PMHNP Burgholzer also lack any causality between her conduct and Plaintiff's harm.  Although PMHNP Burgholzer authorized Mr. Gosier's discharge from suicide watch, he would return to suicide watch the following day, on August 17.  ECF 84-14 (Ex. 13, Cell Transfer Log); ECF 77-8 at 45 (Ex. 5, Inmate Classification File).  The alleged injury Mr. Gosier suffered did not occur until after his subsequent discharge from suicide watch by LCPC Fishell on August 18.  *Id.*  Plaintiff's claims of deliberate indifference by PMHNP Burgholzer therefore do not raise a genuine dispute of material fact and cannot be used as the basis for her state constitutional claims against Wellpath.

In sum, then, because there are genuine issues of material fact regarding the entities' *respondeat superior* liability for constitutional violations allegedly committed by one or more of their employees, Wellpath's and Wicomico's motions for summary judgment will be denied as to Plaintiff's Article 24 claims in Count III.

### C.  Negligence and Wrongful Death (Counts IV and V)

In Counts IV and V of her Amended Complaint, Plaintiff alleges claims against Wicomico for negligence and wrongful death.  Under Maryland common law, a local government is immune from tort liability when it functions in a "governmental" capacity, but it enjoys no such immunity when it is engaged in activities that are "proprietary" or "private" in nature.  *Zilichikhis v. Montgomery Cty.*, 223 Md. App. 158, 192 (2015).  In prior cases, Maryland appellate courts have found that numerous functions are entitled to governmental immunity, including the operation of courthouses, health departments, town pools, and public parks.  *Jones v. Montgomery Cty.*, 2016 WL 1321396, at *4 (Ct. Spec. App. Md. Apr. 5, 2016).  In *Jones*, a Maryland Court found that Montgomery County was immune from tort liability based on its operation of a detention facility.  *Id.* at *6.  The Court reached its decision after analyzing the legislative authority by which the

County operated and the extent to which the County delegated authority to private entities. *Id*. at 5–6 ("[A] county would not be precluded from using a private facility for its prison needs, as long as there were sufficient guidelines to ensure that the facility act [*sic*] in accordance with the legislative will").

Here, Wicomico offered evidence that its operation of prisons and jails is "sanctioned by legislative authority." *Zilichikhis*, 223 Md. App. At 192. *See* ECF 77-1 at 46 (stating that the Wicomico County Department of Correction was created pursuant to Section § 10-304(c)(1)-(2) of the Local Government Article and was delegated the power to operate "all programs pertaining to detention and rehabilitation of persons under the jurisdiction of the county government awaiting trial or having been convicted of a crime . . ."). Wicomico also offers evidence showing that the WCDC is operated with Wicomico County employees. *Id*.

Plaintiff offers no evidence to show that Wicomico is not entitled to governmental immunity on Counts IV and V. In fact, Plaintiff does not even address her state common law claims in her oppositions to the Motions, perhaps recognizing the flaws in her legal theories. *See* ECF 84. Wicomico is entitled to summary judgment on Counts IV and V.

IV.    **CONCLUSION**

For the reasons set forth above, Defendant Wicomico's Motion for Summary Judgment, ECF 77 is **GRANTED** as to Counts I, IV, and V, and **DENIED** as to Count III. and Defendant Wellpath's Motion for Summary Judgment, ECF 74, is **GRANTED** as to Count II and **DENIED** as to Count III. Defendant Wicomico's Motion for Judgment on the Pleadings, ECF 75, is denied as moot. A separate order is filed herewith.

Dated:  September 7, 2021

> /s/
> _____
> Stephanie A. Gallagher
> United States District Judge